Docketing E-Mail: pxdocketing@bhfs.com

Kory A. Langhofer – 024722
klanghofer@bhfs.com
Thomas J. Basile – 031150
tbasile@bhfs.com
**BROWNSTEIN HYATT FARBER
SCHRECK, LLP**
One East Washington Street, Suite 2400
Phoenix, Arizona 85004
Telephone:  602.382.4040
Facsimile:  602.382.4020

*Attorneys for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Public Integrity Alliance, Inc., an Arizona nonprofit membership corporation; Bruce Ash, an individual; Fernando Gonzales, an individual; Ann Holden, an individual; Lori Oien, an individual; and Ken Smalley, an individual, | No. |
| | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | (Oral Argument Requested) |
| City of Tucson, a chartered city of the State of Arizona; Jonathan Rothschild, in his capacity as the Mayor of the City of Tucson; Regina Romero, Paul Cunningham, Karin Uhlich, Shirley Scott, Richard Fimbres, and Steve Kozachik, each in his or her capacity as a member of the Tucson City Council; and Roger Randolph, in his capacity as the Clerk of the City of Tucson, | |
| Defendants. | |

The City of Tucson has a highly unorthodox method of electing its City Council. The system mixes partisan primaries held separately in each of the City's six wards with a citywide general election in which the wards' nominees are elected by all Tucson voters on an at-large basis (the "Hybrid System"). *See* Tucson City Charter ch. XVI, § 9.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1   Although it may have been well intentioned, the Hybrid System denies or dilutes

2   the right to vote held by each Tucson citizen in violation of the Fourteenth Amendment to

3   the United States Constitution.  As expounded by the Supreme Court, the guarantee of

4   equal protection dictates that "[o]nce a geographical unit for which a representative is to

5   be chosen is designated, all who participate in the election are to have an equal

6   vote…wherever their home may be in that geographical unit."  *Gray v. Sanders*, 372 U.S.

7   368, 379 (1963).  If each member of the Tucson City Council represents the entire city,

8   then the Hybrid System denies the franchise to duly registered primary voters residing in

9   other wards who wish to cast a ballot for their representatives.  On the other hand, if each

10  member of the Tucson City Council represents only his/her own ward, then the Hybrid

11  System unconstitutionally dilutes the votes of electors in that ward by allowing electors

12  residing outside the ward to vote in (and effectively decide the outcome of) the ward's

13  general elections.  **Either way**, the Hybrid System is unconstitutional.

14  Pursuant to Federal Rule of Civil Procedure 65 and 28 U.S.C. § 2202, Plaintiffs

15  Public Integrity Alliance, Inc. ("the Alliance"), and Bruce Ash, Fernando Gonzales, Ann

16  Holden, Lori Oien, and Ken Smalley (the "Individual Plaintiffs," and together with the

17  Alliance, the "Plaintiffs"), hereby move the Court for a preliminary injunction (1)

18  prohibiting the Defendants from enforcing or relying upon Chapter XVI, Section 9 of the

19  Tucson City Charter in connection with the 2015 Tucson City Council elections and any

20  future election for that office, and (2) providing that, pending an amendment to the

21  Tucson City Charter, all primary and general elections for the office of Tucson City

22  Council must be conducted on either an entirely ward-based or an entirely at-large basis.

### MEMORANDUM OF POINTS AND AUTHORITIES

#### FACTUAL BACKGROUND

25  The Alliance is a non-profit membership corporation organized under the laws of

26  the State of Arizona.  Compl. ¶ 4.  Its purpose is to advance policies that promote ethics,

27  transparency, and accountability in government, as well as to advocate and promote the

28  protection of voting rights and the integrity of the electoral process.  *Id.*  Each of the

2

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

Individual Plaintiffs is a resident and qualified elector of the City of Tucson and is registered to vote as a member of the Republican Party. *See id.* ¶¶ 7-10. The Alliance's members include duly registered voters in the City of Tucson. *See id.* ¶ 5.

Pursuant to Chapter XVI, Section 8 of its Charter, the City of Tucson is divided into six wards composed of substantially equal populations; one seat on the six-member City Council is allotted to each ward, and a candidate for the City Council must reside in the ward from which he or she seeks to be nominated. *See* Tucson City Charter ch. III, § 1; ch. XVI, §§ 5, 9. The four year terms of the City Council members are staggered, and elections are held on a biennial basis in odd-numbered years. *See id.* ch. XVI, §§ 3-4. Candidates for the seats allotted to Ward 1, Ward 2 and Ward 4 will run in 2015, while elections for the seats designated to Ward 3, Ward 5 and Ward 6 will next be held in 2017. The candidates nominated in the ward-based primaries then compete in an at-large general election in which all registered voters in the City of Tucson may participate. *See* Compl. ¶ 24. Every voter may select one candidate for each of the three City Council seats appearing on the ballot. *Id.* A ward's nominees compete in the general election only against other candidates nominated in the same ward. On at least eight occasions between 1991 and 2013, a candidate has won election to the City Council despite failing to win a plurality of the vote in the at-large general election in the ward from which he or she had been nominated. *See id.* ¶ 28.

### ARGUMENT

"[P]reliminary relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000) (quoting *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987).

3

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1    All these factors uniformly and decisively impel the entry of an order enjoining
2    the Defendants from employing the Hybrid System in connection with the 2015 Tucson
3    City Council elections and all Tucson City Council elections thereafter held.   Any
4    cognizable governmental interests upon which the Hybrid System is predicated must
5    instead be advanced by adoption of a wholly ward-based or a wholly at-large method of
6    electing City Councilors that heeds the constitutional command of equal protection.

7    **I.**    **Plaintiffs Are Highly Likely to Succeed on the Merits**

8         **A.**    **The Strict Scrutiny Standard Governs Plaintiffs' Claims**

9    A cornerstone of the constitutional edifice, the right to vote is "regarded as a
10   fundamental political right, because preservative of all other rights." *Yick Wo v. Hopkins*,
11   118 U.S. 356, 370 (1886).  As a product of the Equal Protection Clause strand of the
12   Supreme Court's "fundamental rights" jurisprudence, the essence of the right is one "to
13   participate in state elections on an equal basis with other qualified voters whenever the
14   State has adopted an elective process for determining who will represent any segment of
15   the State's population." *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35
16   n.78 (1973); *see also Harris v. McRae*, 448 U.S. 297, 322 (1980) ("[I]f a State adopts an
17   electoral system, the Equal Protection Clause of the Fourteenth Amendment confers upon
18   a qualified voter a substantive right to participate in the electoral process equally with
19   other qualified voters").  "[T]he right of suffrage can be denied by a debasement or
20   dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the
21   free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).[1]

22   Courts have devised a two-tiered approach for evaluating encumbrances on the
23   franchise.  When a regulatory burden on voting rights is "severe," "it must be 'narrowly
24   drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504

---

25
26   [1]    The Fourteenth Amendment constrains local governments to the same extent as
     their state-level counterparts. *See Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 480 (1968)
27   ("The actions of local government are the actions of the State. A city, town, or county
     may no more deny the equal protection of the laws than it may abridge freedom of
28   speech, establish an official religion, arrest without probable cause, or deny due process
     of law.").

U.S. 428, 434 (1992) (internal citation omitted).  By contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.* (internal citation omitted); *see also Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (affirming the applicability of *Burdick*'s "balancing test" to voting rights claims).

Although federal courts have not formulated an exhaustive enumeration of "severe" burdens, as contradistinguished from "reasonable" restrictions, the Ninth Circuit has instructed generally that the former are denoted by measures that deny an eligible voter "an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters."  *See Dudum v. Arntz*, 640 F.3d 1098, 1109 (9th Cir. 2011).  More specifically, two categories of electoral arrangements impart burdens that are inherently "severe" and thus are subject strict scrutiny.  "The first type includes regulations that unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election….The second type are regulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit."  *See Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).

As set forth below, the Hybrid System necessarily either denies or dilutes the franchise of the Individual Plaintiffs, depending upon what geographical reference point serves as the relevant "electoral unit"—and in either event, the Hybrid System is unconstitutional and must be enjoined.

**B.     The Hybrid System Denies the Plaintiffs their Right to Vote**

The right to vote guarantees that "[o]nce a geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote…wherever their home may be in that geographical unit."  *Gray*, 372 U.S. at 379; *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("In decision after decision,

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

5

1    this Court has made clear that a citizen has a constitutionally protected right to participate
2    in elections on an equal basis with other citizens in the jurisdiction."); *Hadley v. Junior*
3    *Coll. Dist. of Metro. Kansas City, Mo*., 397 U.S. 50, 55 (1970) (emphasizing that "the
4    crucial consideration is the right of each qualified voter to participate on an equal footing
5    in the election process").   Thus, a critical fulcrum of this dispute is identifying the
6    relevant "geographical unit" presented by the Hybrid System; is each ward a discrete
7    electoral unit unto itself, or is the City as a whole the germane geographical locus? The
8    answer will in turn supply the doctrinal and conceptual lens through which the Court
9    should evaluate the City's disparate treatment of voters on the basis of their ward of
10   residence.

11              1.    The City as a Whole is the Relevant "Geographical Unit"

12       Because the ability to select any given ward's City Council member is vested in <u>all</u>
13   qualified electors of Tucson by means of an at-large general election, the City as a whole
14   necessarily is the relevant "geographical unit" in assessing the City's adherence to its
15   equal protection obligations.   Confronting the question of whether Council members are
16   more accurately characterized as representatives of the city as a whole or of only their
17   particular ward, the Arizona Supreme Court expressly concluded that "Tucson council
18   members, although nominated by ward, represent the entire city, just as do council
19   members elected at large in other cities."   *See City of Tucson v. State*, 273 P.3d 624, 631
20   (Ariz. 2012).[2]

21   _____

22   [2]      The state court litigation centered on whether the Tucson City Charter was subject
     to preemption by an Arizona state statute proscribing the use of such hybrid arrangements
23   in municipal elections.   *See* Ariz. Rev. Stat. § 9-821.01.   Concurring with Tucson's
     assertion that its chosen method of electing city officers was a matter of "purely
24   municipal concern," the Arizona Supreme Court held that the state statute could not
     displace the City Charter's adoption of a hybrid electoral system.   Although the court
25   further concluded that Tucson's use of at-large general elections did not contravene the
     federal Voting Rights Act, no party raised, and the court never evaluated, whether the
26   Hybrid System effectuated the denial or dilution of any elector's right to vote under the
     Fourteenth Amendment.   Indeed, the court implicitly acknowledged that the City
27   Charter's conformance to the parameters of Tucson's "home-rule" authority was not
     dispositive of its constitutional *bona fides*.   *See* 273 P.3d at 632 (cautioning that in
28   fashioning its electoral system, Tucson "must of course comply with the Arizona
     Constitution and federal law").

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1    The Arizona Supreme Court's finding on this point is fully consonant with – and
2    indeed necessarily compelled by – federal courts' voting rights jurisprudence.  Simply
3    put, the germane "geographical unit" is the one "for which a representative is to be
4    chosen." *See Gray*, 372 U.S. at 379.   In other words, once a state or municipality
5    designates a particular constituency for a given representative, the corresponding
6    geographic area is the applicable "unit" for assessing equal protection challenges.  The
7    ability to cast a vote for a candidate is the dispositive nexus establishing a
8    "representative" relationship.  *Gray*, which adjudicated the constitutionality of Georgia's
9    county-based method for deciding primary election contests, aptly illustrates the point.
10   Although voters within each county undisputedly were accorded equal treatment in the
11   electoral process, the Court nevertheless deemed the scheme constitutionally infirm
12   because of the discriminatory effect it exerted across counties.  Notably, the Court's
13   analysis was founded in the premise that because the offices on the ballot (*i.e.*, statewide
14   positions) were subject to a vote of the statewide electorate in the general election – and
15   thereby functioned as representatives of the entire state – the relevant "geographical unit"
16   was the state as a whole, not any particular county in isolation.  It necessarily follows that
17   all aspects of the electoral process pertaining to that office, to include the procedures for
18   nominating candidates, must be open to all qualified electors on equal terms.  *See Gray*,
19   372 U.S. at 381 ("[O]nce the class of voters [for a given office] is chosen and their
20   qualifications specified, we see no constitutional way by which equality of voting power
21   may be evaded.").
22       While few cases have elucidated the "geographical unit" concept, the existing
23   precedents have conformed to the principle enunciated in *Gray*, namely, that once a state
24   or municipality has designated an office as the representative of a given constituency, the
25   corresponding geographical ambit is the operative "unit" for equal protection purposes.
26   *See, e.g.*, *Mixon v. State of Ohio*, 193 F.3d 389, 405 (6th Cir. 1999) ("If the municipal
27   school boards [which represented both Cleveland and its surrounding suburbs] were
28   elected [rather than appointed] bodies and only the Cleveland residents could vote in the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

school board election, the relevant geographical entity would be the municipal school district" and strict scrutiny would apply to any exclusion of suburban voters.); *Cecelia Packing Corp. v. U.S. Dept. of Agric./Agric. Mktg. Serv.*, 10 F.3d 616, 624 (9th Cir. 1993) (citing cases in which "the officials elected…exercise general governmental power over the entire geographic area served by the elected body" and noting that "[l]imitations on voting in this type of election generally are reviewed under a strict scrutiny standard"); *cf. Hussey v. City of Portland*, 64 F.3d 1260 (9th Cir. 1995) (invaliding under strict scrutiny ordinance that afforded subsidy to certain voters within area to be annexed but not to others, finding that it "severely and unreasonably interferes with the right to vote").

The City's choice to elect Council members on a citywide, at-large basis necessarily forges a representational nexus between each Council member and every Tucson elector, regardless of his or her ward of residence.  By thus designating the city as a whole as the "geographical unit for which a representative is to be chosen," *see Gray*, 372 U.S. at 379, the City must ensure equal treatment of <u>all</u> Tucson voters in <u>all</u> facets of the electoral process, to include the primary election.  *See Smith v. Allwright*, 321 U.S. 649, 664 (1944) (holding generally that "the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election").

### 2.    The Hybrid System Effectuates Vote Denial

If the Court agrees that the city as a whole is the appropriate geographical predicate for analyzing the Plaintiffs' vote denial claim, it follows that the Hybrid System necessarily denies Tucson electors the ability to participate in each ward's primary elections on equal terms.   To be sure, the City presumably will contend that no eligible Tucson elector has been denied his right to vote.  To this end, the City likely will reason that each elector is afforded one vote in his ward's primary, plus an additional three votes (one for each ward seat on the ballot in any given cycle) in the at-large general election, thereby equalizing the opportunity to participate.

1       The argument that no equal protection injury is exacted because every elector is

2 barred from participating in the nomination process for five of his six Council

3 representatives, however, fundamentally misapprehends the nature of the right to vote.  If

4 the Court accepts the premise that every Council member represents the entire electorate

5 of the city, it is untenable to suggest that the denial of a Ward 6 resident's right to cast a

6 primary election ballot for his preferred Ward 1 nominee in 2015 is somehow remedied

7 by denying a Ward 1 resident the same prerogative in Ward 6's primary two years hence.

8 An equal protection injury is inflicted whenever an otherwise eligible voter is deprived of

9 the right to participate on equal terms in <u>any</u> aspect of <u>any</u> single election in the

10 geographical unit.[3]  Indeed, courts have adopted a decidedly jaundiced view of the notion

11 that a state or municipality can somehow "cancel out" equal protection infractions over

12 the course of multiple elections.  Concluding that a New York statute permitting party

13 officials from outside the relevant congressional district to participate in nomination

14 decisions in special elections violated Article I, Section 2 of the Constitution, the Second

15 Circuit opined:

16       We are not impressed by the argument…that any injury inflicted on the
17 voters in the 21st C.D. by the participation of persons elected from other
      districts is compensated by the potential reciprocal ability of persons
18 elected by voters in the 21st C.D. to inflict injury on the voters in other
      Congressional districts when, as and if special elections should be held
19 there.

20

---

21 [3]     Although not material to the merits of Plaintiffs' vote denial claims, the staggered
nature of the City Council elections vividly underscores the gravity of the Defendants'
22 equal protection violations.  If it is accepted that every Council member represents the
entire city, the wholesale exclusion of a Ward 6 voter, such as Plaintiff Mr. Smalley from
23 the 2015 primary elections cannot plausibly be characterized as anything other than an
arrant denial of the franchise.  *See Gray*, 372 U.S. at 380 ("[T]here is no indication in the
24 Constitution that homesite…affords a permissible basis for distinguishing between
qualified voters within" the jurisdiction).  It is no answer to point out that Mr. Smalley
25 will be permitted to vote in one of the three primaries held in 2017.  As noted above,
Plaintiffs are aware of no case holding that a state or locality can remedy an equal
26 protection violation as to one subset of the population by inflicting a corresponding injury
on other citizens at a future time.  For the same reason, the equal protection problem
27 posed by the Hybrid System would not be ameliorated by holding simultaneous primaries
in all six wards; if every Council member is a citywide representative, then <u>each</u> City
28 elector is entitled to participate on equal terms in <u>each</u> nominating election.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

9

*Montano v. Lefkowitz*, 575 F.2d 378, 387 n.15 (2d Cir. 1978). The First Circuit espoused a similar sentiment when invalidating a city's plan to limit participation in a curative primary election only to those voters who had cast a ballot in the prior invalid election. Rejecting the notion that "the ability to vote in the general election [was] a satisfactory alternative for those voters not allowed to vote in the primary," the court noted that "the candidate of their choice may have been excluded in the preliminary election from which they were barred." *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 731 n.5 (1st Cir. 1994).

### 3.   The Hybrid System Fails Strict Scrutiny

If the Court agrees that the relevant geographical unit is the city as a whole, it follows that the denial of the franchise to any City elector in any ward's primary election exacts a severe burden on his or her right to vote, thereby subjecting the Hybrid System to strict scrutiny. *See  Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969) ("[I]f a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."). Indeed, the abrogation of any voter's "opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters" is the distinguishing attribute of a "severe" burden warranting strict scrutiny. *See Dudum*, 640 F.3d at 1109.

It is highly unlikely that the City can successfully demonstrate that its Hybrid System represents the most narrowly tailored means of advancing a compelling interest. Presumably, the City will posit that ward-based primaries are designed to induce closer ties between ward residents and "their" representative on the City Council, and thereby enhance democratic responsiveness.  As an initial matter, courts have generally foreclosed attempts to limit participation in the electoral process to those possessing a putatively distinct interest in the outcome.  *See, e.g.*, *Kramer*, 395 U.S. at 632 (invalidating law limiting participation in school board elections to parents of schoolchildren and those who owned or rented property in the district, reasoning that even assuming the state can restrict voting only to those with a particular interest, the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

statute "does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise"); *Hill v. Stone*, 421 U.S. 289 (1975) (holding that bond issue for construction of library was not a true "special interest" election and thus did not justify exclusion of non-property owners); *see also Hussey*, 64 F.3d at 1266 (holding that "promoting stability of neighborhoods and aligning service and tax boundaries" were not "compelling" interests that could justify disparate treatment).

Further, even if fostering greater accountability to ward residents is a "compelling" interest, the more narrowly tailored alternative is plainly to provide for purely ward-based elections. That candidates may be – and sometimes are – rejected in the general election by voters in "their" ward yet propelled into office by votes cast in other wards belies any contention that the Hybrid System is a narrowly tailored means of fortifying democratic localism.

### C.   In the Alternative, the Hybrid System Dilutes the Votes of the Individual Plaintiffs

Even if the City can successfully maintain that each Council member is most accurately characterized as a representative only of his or her ward – thus rendering each ward (rather than the city as a whole) the relevant "geographical unit" – the Hybrid System remains unconstitutional. Specifically, expanding the franchise in the general election to those who are not constituents of a Council member (at least not under the premise that City Council members represent only their own wards) would unconstitutionally dilute the votes of electors residing in the ward.

As a threshold matter, the Supreme Court has held that county or city bodies elected on an at-large basis but subject to district-based candidate residency requirements do not implicate "one person, one vote" concerns. *See Dallas Cnty. v. F.D. Reese*, 421 U.S. 477 (1975); *Dusch v. Davis*, 387 U.S. 112 (1967).[4]  Crucially, however, the Court

---

[4]     For this reason, Plaintiffs do not challenge the City's imposition of a ward-based residency requirement for City Council candidates. *See* Tucson City Charter ch. XVI, §§ 5, 9.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1   cautioned that "different conclusions might follow" if the districts served as "the

2   basis…for voting or representation," rather than merely the situs of candidates' residence.

3   *See Dusch*, 387 U.S. at 115.  By firmly tethering the ward subdivisions to "voting or

4   representation" in City Council elections, the City cannot avail itself of the "safe harbor"

5   afforded by *Dusch* and *Dallas County*.

6       In this vein, federal courts have consistently recognized that extensions of the

7   franchise to individuals residing outside the relevant geographical unit beget cognizable

8   vote dilution claims.  *See, e.g.*, *Duncan v. Coffee Cnty., Tenn.*, 69 F.3d 88, 94 (6th Cir.

9   1995) (concluding that under certain conditions "the inclusion of 'out-of-district' voters

10  in another district's elections unconstitutionally dilutes those votes" (internal quotation

11  omitted)); *Locklear v. N.C. State Bd. of Elections*, 514 F.3d 1152, 1154 (4th Cir. 1975)

12  (holding that conferral of the franchise on individuals residing outside the relevant

13  geographical area presents a "dilution of the right to vote").  Although it appears the

14  Ninth Circuit has never squarely addressed this specific factual constellation, it has held

15  categorically that electoral arrangements that "contravene the principle of 'one person,

16  one vote' by diluting the voting power of some qualified voters within the electoral unit"

17  are subject to strict scrutiny.  *See Green*, 340 F.3d at 900.[5]

18      Even if evaluated through the lens of a more lenient standard of review, however,

19  the Hybrid System effectuates an impermissible dilution of the Individual Plaintiffs'

20  votes for at least two reasons.  First, even presupposing the validity of the governmental

21  interest undergirding the at-large general election – which presumably is the desire to

22  cultivate accountability mechanisms and incentivize City Council members to act for the

23  benefit of the City as a whole – the Hybrid System is not sufficiently related to the

24  furtherance of that end.  Specifically, if the ability of a Ward 6 voter to cast a general

---

25

26  [5]     Courts in other jurisdictions have diverged with respect to the appropriate standard
    of review applicable to this variant of vote dilution claims.  *Compare Locklear*, 514 F.3d
27  at 1154 (holding that overinclusiveness of the franchise is unconstitutional "unless the
    [government] can adduce a compelling justification") *with Bd. of Cnty Comm'rs of
28  Shelby Cnty., Tenn. v. Burson*, 121 F.3d 244, 248 (6th Cir. 1997) (indicating that rational
    basis was the germane rubric).

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1    election ballot for Ward 1's representative is necessary to foster democratic

2    responsiveness and improve the institutional functioning of the Council, there is no

3    apparent rational reason for excluding the same Ward 6 voter from Ward 1's primary

4    election.  *See Hosford v. Ray*, 806 F. Supp. 1297, 1307 (S.D. Miss. 1992) (noting the

5    "irrationality" of permitting voters in a city outside the school district to vote for the

6    executive arm of the school board but not the legislative/judicial arm of the district).

7          Second, and more significantly, even courts that have articulated highly deferential

8    approaches to overinclusive voting arrangements have cautioned that such schemes

9    traverse equal protection limits if they afford "outside" voters the numerical strength to

10   decide electoral outcomes.  *See, e.g.*, *Burson*, 121 F.3d at 250 (holding that franchise was

11   over-inclusive in part because voters of city outside the school district had voting strength

12   sufficient to control seats on the governing body); *Duncan*, 69 F.3d at 97 ("Where the

13   government allocates the franchise in such a manner that residents of a separate area have

14   little or no chance to control their own [representatives], there may be grave

15   constitutional concerns, even where out-of-district voters have a substantial interest.");

16   *Sutton v. Escambia Cnty. Bd. of Educ.*, 809 F.2d 770, 773 (11th Cir. 1987) (sustaining

17   overinclusive school district election scheme in part because votes of residents of city

18   served by another district had never been outcome determinative and comprised only a

19   quarter of the total electorate); *Creel v. Freeman*, 531 F.2d 286, 288 (5th Cir. 1976)

20   (upholding overinclusive arrangement in part because the facts "do not show domination

21   by such [outside] residents over county school board elections").

22         Notably, in each of the overinclusive voting arrangements upheld by the courts,

23   the extra-jurisdictional (or "outside") voters composed only a small minority of the

24   overall electorate.  In Tucson, by contrast, the general election voters residing outside any

25   given ward collectively constitute, on average, approximately 80% of the total electorate.

26   Thus, the Hybrid System ensures that the overwhelming majority of the electorate for,

27   *e.g.*, the Ward 1 Council seat resides <u>outside</u> Ward 1.  If the relevant geographical unit is

28   the ward itself, such an arrangement is *per se* constitutionally defective.  *See Hosford*,

                                                    13

806 F. Supp. at 1306 (invalidating overinclusive scheme in part because the ballots of "outside voters,"  even while not outcome determinative, substantially affected candidates' vote margins); *Sutton*, 809 F.2d at 773 (upholding system in which "outside" electors "accounted for no more than 26% of the votes cast in a single election.").

The notion that a ward's representative on the Council could be chosen by electors residing outside the jurisdiction is not a hypothetical contrivance.  On at least eight occasions since 1991, a candidate for City Council has failed to garner plurality support in the general election from voters in his or her ward, yet still acceded to the Council on the strength of ballots cast elsewhere in the City.  *See* Compl. ¶ 28.  Thus, of the thirty-three Council races appearing on the general election ballot between 1991 and 2013, 24% were decided by "outside" voters, who effectively vetoed a ward's choice of its designated Council representative.  In sum, even if each Council member is properly characterized as a "representative" only of his particular ward, the Hybrid System inescapably exerts an unconstitutionally dilutive effect on the votes of each ward's electors by vesting the ability to choose their representative in residents of other wards.

### D.    The City Must Adopt Either a Wholly Ward-Based or Wholly At-Large System for Electing the City Council

Any cognizable governmental interests the City may invoke in defense of the Hybrid System will be equally – if not more effectively – advanced by selecting Council members on an entirely ward-based or an entirely at-large basis; either alternative will satisfy the constitutional imperative of equal protection, and the Plaintiffs take no position on the normative question of which arrangement represents a preferable policy. The most benign rationale for the Hybrid System is that it embodies an attempt to reconcile the dueling objectives of promoting democratic localism while instilling in Council members a sense of accountability to the City as a whole, not merely the parochial interests of a particular ward.  In its practical operation, however, the arrangement actually undermines both aspirations in a manner deeply injurious to the constitutional guarantee of equal protection.  By denying five-sixths of the City's electors

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

14

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

any opportunity to participate in a given ward's process of selecting nominees for the at-large election, the Hybrid System effectuates a wholesale deprivation of the franchise and erodes the putative policy goal of ensuring that Council members remain responsive to a Citywide electorate.   Conversely, the capacity of voters outside a given ward to collectively override that ward's choice of its preferred candidate in the general election dilutes the franchise while also subverting the objective of conducing closer ties between ward residents and "their" representative on the Council.   In sum, the Hybrid System represents a means that is profoundly incongruent with the governmental interests it is ostensibly intended to advance, and is unconstitutional under any standard of review.

## II.   Absent Preliminary Relief, the Plaintiffs Will Suffer Irreparable Injury

"Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is likely in the absence of an injunction.'"   *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)).   An unconstitutional deprivation or dilution of a duly qualified elector's right to vote is intrinsically injurious and warrants injunctive relief. *See Cardona v. Oakland Unified Sch. Dist.*, California, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."); *cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").   That the nomination petition filing period for Council candidates begins on April 27 underscores the imminent nature of the injury and the necessity of preliminary relief.

## III.   The Balance of Hardships Sharply Favors Plaintiffs

The concrete legal injuries sustained by the Plaintiffs in the form of a denial or dilution of the franchise are discussed at length above.   The Defendants, by contrast, can adduce no countervailing considerations necessitating the continued enforcement of a

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

constitutionally defective electoral arrangement. *See Puente Ariz. v. Arpaio*, No. CV–14–01356, 2015 WL 58671, at *19 (D. Ariz. Jan. 5, 2015) ("Enjoining the enforcement of laws that are likely [invalid] will impose little hardship on Defendants."); *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1216-17 (D. Ariz. 2013) ("Defendants would suffer no harm in being enjoined from enforcing unconstitutional…laws, so the balance of hardships tips in favor of the Plaintiffs.").

## IV.   Public Policy Favors an Injunction

There simply is no substantial public policy interest that is advanced by enforcing a law that is unconstitutional on its face. *See Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012) (holding that defendant "can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional" enactment). Public policy favors ensuring that the rights of not only these Plaintiffs, but all Tucson electors whose right to vote will be impermissibly denied or diluted by operation of the Hybrid System, are protected. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") (internal citation omitted).

## V.   Additional Requirements for Preliminary Relief

### A.   Notification to Opposing Counsel

Pursuant to Rule 65(a)(1), undersigned counsel certifies that Defendants have received notice of this filing. In a telephone call on April 6, 2015 counsel for the Plaintiffs notified Michael Rankin, the City Attorney of Tucson, that the Plaintiffs intended to commence this action and intended to seek a preliminary injunction from the Court. An electronic copy of this Motion will be e-mailed to the Tucson City Attorney contemporaneously with this filing.

### B.   A Bond Should Not Be Required

Under Rule 65(c), a plaintiff seeking preliminary relief must generally post a bond "in an amount that the court considers proper." However, the "court has discretion to

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

1  dispense with the security requirement, or to request a mere nominal security, where

2  requiring security would effectively deny access to judicial review." *Van de Kamp v.*

3  *Tahoe Reg. Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985); *see also Barahona-*

4  *Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).  In cases in which a plaintiff is

5  acting in the public interest, courts routinely waive the bond requirement or impose a

6  nominal bond.  *See Van de Kamp*, 766 F.2d at 1325-26.  Here, the Plaintiffs are seeking

7  to vindicate the rights of all individuals whose right to vote is denied or abridged as a

8  consequence of the Hybrid System.  Anything more than a nominal bond would have a

9  chilling effect on efforts to vindicate public rights, and would deter future judicial review

10  of unconstitutional enactments.

## CONCLUSION

11

12  For the foregoing reasons, this Court should grant a preliminary injunction that (1)

13  prohibits the Defendants from enforcing or relying upon Chapter XVI, Section 9 of the

14  Tucson City Charter in connection with the 2015 Tucson City Council elections and any

15  future election for that office, and (2) provides that, pending an amendment to the Tucson

16  City Charter that is consistent with the United States and Arizona Constitutions, all

17  primary and general elections for the office of Tucson City Council must be conducted on

18  either an entirely ward-based or an entirely at-large basis.

19  RESPECTFULLY SUBMITTED this 6th day of April, 2015.

20                    BROWNSTEIN HYATT FARBER
                      SCHRECK, LLP
21

22                    By:   *s/Thomas J. Basile*
                           Kory A. Langhofer
23                         Thomas J. Basile
                           One East Washington Street, Suite 2400
24                         Phoenix, Arizona 85004
                           *Attorneys for the Plaintiffs*
25

26

27

28