LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
PC
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719
Richard M. Rollman, SB#004116
rollman@bossefunklaw.com
Richard A. Brown, SB#013779
brown@bossefunklaw.com
Michael G. Rankin, SB#015989
mike.rankin@tucsonaz.gov
Dennis McLaughlin, SB#009197
dennis.mclaughlin@tucsonaz.gov
OFFICE OF THE TUCSON CITY ATTORNEY
P.O. Box 27210
Tucson, Arizona 85726-7210
Attorneys for Defendants

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**FOR THE COUNTY OF**

Public Integrity Alliance, Inc., an Arizona nonprofit membership corporation; Bruce Ash, an individual; Fernando Gonzales, an individual; Ann Holden, an individual; Lori Oien, an individual; and Ken Smalley, an individual,

Plaintiffs,

vs.

City of Tucson, a chartered city of the State of Arizona; Jonathan Rothschild, in his capacity as Mayor of the City of Tucson; Regina Romero, Paul Cunningham, Karin Uhlich, Shirley Scott, Richard Fimbres, and Steve Kozachik, each in his or her capacity as a member of the Tucson City Council; and Roger Randolph, in his capacity as the Clerk of the City of Tucson,

Defendants.

No. 4:15-cv-00138-CKJ

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Defendants respond to and oppose Plaintiffs' Motion for Preliminary Injunction.

**INTRODUCTION**

Tucson Charter Chapter XVI, § 9 provides that candidates for council member will be nominated by the respective voters of their wards of residence and elected at large by all City

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

voters. Plaintiffs assert that this violates the Fourteenth Amendment's Equal Protection Clause, as well as two provisions of the Arizona Constitution, Article 2, § 13, the Arizona equivalent of the Equal Protection Clause, and Article 2, § 21, Arizona's "free and equal" elections clause. *See* Compl. ¶¶ 35 (Count I), 55 (Count III), 64 (Count IV);[1] Mot. for Prelim. Inj. ("Mot.") at 8, 10. Per Plaintiffs, the City's primary and general elections must both be either entirely ward-based or entire at-large. *See* Compl. at 13; Mot. at 14.

As the City demonstrates below, Plaintiffs do not assert a viable claim under the Fourteenth Amendment or either of the Arizona constitutional provisions. These provisions all leave the City free to delineate different residency requirements (and thus different electoral jurisdictions and electorates) for different elections, so long as the City does not engage in voter discrimination or unequal weighting of votes among the eligible voters in a particular election, something it is not doing and that Plaintiffs do not allege here. And when, as here, persons residing outside the electoral jurisdiction delineated for a given election try to challenge such residency requirements on equal protection grounds, this Court is to apply rational basis review, not strict scrutiny. The City's current system is constitutional under the Fourteenth Amendment, which does not give Plaintiffs any "right" to have the residency qualification (and thus electoral district) used for the City's primary election be the same as the one used for the City's general election.

---

[1] Plaintiffs' Count II does not accord with either the facts of this case, as presented by both parties, or the law applicable to those facts, as argued by both parties. This Court should simply ignore that claim and, ideally, dismiss it. But first note that on Count II, Plaintiffs argue that allowing City voters just one primary vote and one general election vote is constitutional, but allowing one primary vote and three general election votes is not.

Plaintiffs also allege that on at least eight occasions since 1991, a candidate has won election in the City's at-large elections despite failing to carry the candidate's ward. *See* Compl. ¶ 28; Mot. at 14. Plaintiffs fail to mention that one of their alternate forms of relief sought (Citywide primary *and* general elections) would not only allow that to continue to occur, but also make the same thing possible in any or all of the primary elections.

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

## ARGUMENT

### I. Through their Charter, the City's Voters Specify Different Voter Residency Qualifications for their Primary and General Elections.

Charter Chapter III, § 1 provides for government of the City through a unitary mayor and council, but with each council member also residing in a geographically distinct ward:

> The government of said city shall be vested in a mayor and a council of six (6) members, one (1) from each ward. They shall be nominated, elected, and have such powers and duties as are provided by this Charter.

Charter Chapter XVI, § 9, the provision at issue here, provides that council members will be nominated by the respective voters of their wards of residence but elected at large:

> Beginning in the year 1930, and continuing thereafter, the mayor shall be nominated from and elected by the voters of the city at large, and the councilmen shall be nominated each from, and by the respective voters of, the ward in which he resides, and shall be elected by the voters of the city at large.

It is undisputed that because they are ultimately selected in an at-large election in which all qualified electors of the City are eligible to participate, "Tucson council members, although nominated by ward, represent the entire city." *See* Compl., ¶¶ 27, 34; Answer, ¶¶ 17, 23; Mot. at 6; *City of Tucson v. State*, 229 Ariz. 172, 179 ¶ 44, 273 P.3d 624, 631 (2012). To paraphrase the Supreme Court:

> Each [ward's council member] must be a resident of that [ward], but since his tenure depends upon the [City]-wide electorate he must be vigilant to serve the interests of all the people in the [City], and not merely those of people in his [ward]; thus in fact he is the [City]'s and not merely the [ward]'s senator.

*Fortson v. Dorsey*, 379 U.S. 433, 438, (1965) [City changes in brackets].

But it is also clear from Charter Chapter XVI, § 9 that in the City's case, wards are not mere districts of residence for council members, but rather defined electoral jurisdictions in their own right, used for the nomination by a separate primary election of candidates who then compete in the Citywide general election. So that these separately defined electoral jurisdictions comply with the Fourteenth Amendment, the Charter requires that the wards contain, as nearly as possible, the same total population, and provides for periodic ward

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

redistricting to assure compliance with that requirement. TUCSON CHARTER, Ch. XVI, §§ 8, 8.1. Plaintiffs admit that the City's wards are in fact "composed of substantially equal populations." *See* Compl. ¶ 20; Mot. at 3.

Both the ward-based primary elections and the at-large general elections are partisan: the primary selects nominees for particular political parties and the general election ballot identifies candidates by party affiliation. *City of Tucson*, 229 Ariz. at 173 ¶ 2, 273 P.3d at 625. At the City's primary election, persons resident in the ward and registered with a political party qualified for representation on the ballot may vote, but only in their own party's primary,[2] using their party's separate ballot. TUCSON CHARTER, Ch. XVI, § 9; A.R.S. § 16-467(B). Any person who is registered as no party preference or independent as the party preference or who is registered with a political party that is not qualified for representation on the ballot may also vote in the primary election of any one of the political parties that is qualified for the ballot. A.R.S. § 16-467(B); ARIZ. CONST. Art 7, § 10. Thus, the City's primary in each ward consists not of the ward electorate voting as a whole, but rather a separate election for each party qualified for the ballot.

Having nominations through primary elections in each ward, using separate ballots for each party, allows the party electorates in each of those wards to make their own choice of a nominee, and simultaneously acts as a guarantee for the City electorate as a whole that each ward's nominee actually has support among the party members within that ward. Moreover, since nominees compete in the general election only against other candidates nominated in the same ward, *see* Compl. ¶ 24, ward nominations also help assure that each ward has a local representative on the council, and, conversely, that the full Mayor and

---

2 Any outside attempt to force a qualified party to include voters from another qualified party as eligible voters in its primary would run afoul of not only Article 7, § 10 of the Arizona Constitution, but also federal decisions prohibiting such a result. *See California Democratic Party v. Jones,* 530 U.S. 567 (2000); *Ziskis v. Symington*, 47 F.3d 1004 (9th Cir. 1995); *Nader v. Schaffer*, 417 F. Supp. 837 (D.Conn.), *summarily aff'd,* 429 U.S. 989 (1976).

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

Council has members who are aware of each ward's issues, problems, and views. According to the Supreme Court, and reading "ward" for "borough" and "local" for "rural," the City has a valid interest in ward residency for the council members on its unitary governing body:

> The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give due consideration to questions presented throughout the entire area.

*Dusch v. Davis*, 387 U.S. 112, 116 (1967).

Ten weeks after the City's primary election, the City holds its general election. Here, the candidates nominated by the party electorates in the various wards compete against candidates nominated by other parties, and are actually elected to office. The entire City electorate gets to choose its council members from among the nominees from each ward. Plaintiffs concede that "all qualified electors in the City of Tucson may participate" in this at-large general election. *See* Compl. ¶¶ 24, 26; Mot. at 3.

**II. The City's election system is a constitutionally permissible exercise of its voters' charter powers that satisfies the applicable rational basis standard.**

**A. The City's voters are sovereign in choosing their election system.**

Plaintiffs call the City's election system "highly unorthodox." *See* Mot. at 1. First, that is simply their opinion. The California cities of Santa Ana and Newport Beach use the same system as the City, also by city charter.[3] So do general law cities in Kentucky under K.R.S. § 83A.100. More importantly, Plaintiffs' opinion is irrelevant. The Supreme Court recognizes "a State's constitutional responsibility for the establishment and operation of its own government." *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973). "Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs." *Sailors v. Board of Educ. of Kent County.*,

---

[3] Santa Ana: *see* https://www.municode.com/library/ca/santa_ana/codes/code_of_ordinances?nodeId=PTITHCH_ARTIVCICO_DIV1GE_S400NUSETEME. Newport Beach: *see* http://www.codepublishing.com/CA/NewportBeach/.

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

387 U.S. 105, 109 (1967). "Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." *Sailors*, 387 U.S. at 110-11.

This sovereignty of state and local governments specifically includes "the power to regulate elections," and even more specifically "the power to determine within the limits of the Constitution *the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices*." *Oregon v. Mitchell*, 400 U.S. 112, 124-25 (1970) (footnote omitted; emphasis added) (Black, J.); *id*. at 201-02 (Harlan, J.), 293-94 (Stewart, J.). "Each state has the power to prescribe the qualifications of its officers, *and the manner in which they shall be chosen*." *Boyd v. State of Nebraska ex rel. Thayer*, 143 U.S. 135, 161 (1892) (emphasis added). Obviously, state and local governments can exercise these powers in the context of both primary and general elections.

This power includes deciding when and under what specific conditions those elections will be held. "The right to vote intended to be protected [by the 14th Amendment] refers to the right to vote as established by the laws and constitution of the state." *Lassiter v. Northampton County. Bd. of Elections*, 360 U.S. 45, 51, (1959); *McPherson v. Blacker*, 146 U.S. 1, 39 (1892). "In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." *Pope v. Williams*, 193 U.S. 621, 632 (1904). "The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," *Carrington v. Rash*, 380 U.S. 89, 91 (1965), and may "impose voter qualifications and regulate access to the franchise in other ways." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

The City's voters control the method and manner of their local elections, through their Charter, authorized under Article 13, § 2 of the Arizona Constitution. The Charter empowers the City to determine "who shall be its governing officers and how they shall be selected." *City of Tucson*, 229 Ariz. at 180 ¶ 45, 273 P.3d at 632. The City's Charter provisions are "equivalent to an act of the Legislature granting the powers set forth therein." *Buntman v. City of Phoenix*, 32 Ariz. 18, 26, 255 P. 490, 493 (1927).

**B. Residency qualifications like those here need only have a rational basis.**

One of the most fundamental ways that states and localities are empowered to control their elections is through voter residency qualification, created by designating the geographical boundaries of the election jurisdiction to be used for that election. States and localities have "*unquestioned* power to impose reasonable residence restrictions of the availability of the ballot. *Carrington*, 380 U.S. at 91 (emphasis added). "All who participate in the election are to have an equal vote," but only "[o]nce the geographical unit for which a representative is to be chosen is designated." *Gray v. Sanders*, 372 U.S. 368, 379-80 (1963).

The geographical unit in which residency is required for voting by a state or locality can be the whole of the overall jurisdiction. *See, e.g.*, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978). That is the case in the City's general election. Or the geographical unit can be a subunit or portion of a larger jurisdiction, such as the City's wards in its primary election. *See, e.g., City of Herriman v. Bell*, 590 F.3d 1176 (10th Cir. 2010) (vote on proposed school district limited to residents of existing district residing in boundaries of proposed new district); *St. Louis County, Mo. v. City of Town & Country*, 590 F. Supp. 731 (E.D. Mo. 1984) (vote limited to county residents residing within portion of county to be annexed); *Moorman v. Wood,* 504 F. Supp. 467 (E.D. Ky. 1980) (vote limited to city residents living in portion of city affected by proposed deannexation/annexation).

Residency qualifications are not subject to strict scrutiny. *Hill v. Stone*, 421 U.S. 289, 297 (1975); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 625, (1969); *Carlson v.*

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

*Wiggins*, 675 F.3d 1134, 1139 (8th Cir. 2012). Neither are they subject to the standard in *Burdick v. Takushi,* 504 U.S. 428 (1992), used to analyze regulatory burdens placed on those voters or candidates ***who are geographically eligible to participate in an election***. Rather, residency qualifications immediately distinguish between those who do or do not live within the election district the state has defined for a particular election, and thus can or cannot vote. Residency qualifications are analyzed under a rational basis standard. *Holt,* 439 U.S. at 70-71. As the Supreme Court stated in *Holt*, the "line heretofore marked by [our] voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue." *Id.* at 70. "No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions." *Id.* at 68.

The Tenth Circuit's decision in *Herriman* contains a superb review and analysis of the law applicable here. *Id.*, 590 F.3d at 1184-88. It reconfirms the principles set forth in *Holt*, specifically confirming that *Holt*'s rational basis standard applies where the designated voting jurisdiction in which residency is required is a subunit of a larger governmental unit, as is the case with the City ward-based primaries. *Herriman*, 590 F.3d at 1190. And while it does not involve candidate elections, *Herriman* also sets forth general principles directly relevant to the City's use of ward primaries before its at-large general election:

1. "[S]tates have considerable leeway in discriminating against voters residing in ***different*** governmental units or electoral districts even when the outcome of a particular election affects them." *Id.* at 1186.

2. "In addition, the state has the right to draw different boundaries for voting purposes—and we generally defer to these delineations—as long as the separate units further reasonable government objectives." *Id.* at 1185.

3. "[T]he Supreme Court has consistently upheld laws that give different constituencies different voices in elections." *Id.* at 1184.

Thus, that Plaintiffs may be affected by the outcomes of other ward primaries does not mean that the City must allow them to vote in those primaries. *Holt*, 439 U.S. at 69; *Herriman*, 590

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

F.3d at 1186 (point 1 above). And the City's use of ward primaries followed by a Citywide general election furthers the reasonable governmental objectives set forth above in Section I of this Response, *see Herriman*, 590 F.3d at 1185 (point 2 above), and gives its ward voters a specific voice in its elections. *Id.* at 1184 (point 3 above).

Plaintiffs already have admitted that "city bodies elected on at-large basis but subject to district-based candidacy requirements do not implicate 'one person, one vote' concerns." *See* Mot. at 11 (citing *Dallas County v. F.D. Reese*, 421 U.S. 477 (1975); *Dusch, supra*). Yet, Plaintiffs rely on the statements in *Dusch* that "different conclusions might follow" if the districts served as "the basis … for voting or representation," rather than merely the situs of candidates' residence. *Id.* at 11-12 (quoting *Dusch*, 387 U.S. at 115). Considering the law cited above, and the specific time and context in which the two cases were decided, the only contrast that the *Dusch* court wished to draw was with a hypothetical *general* election system based on districts of unequal population, resulting in either unequal representation (*Reynolds v. Sims; Avery v. Midland County*), unequal weighting of votes (*Grey v. Sanders*), or both. But, the City's wards are of substantially equal population and nothing in *Dusch* or *Dallas County* is intended to or does prevent the City from utilizing those wards in a ward-based primary election system feeding into a Citywide general election.

To sum up, Plaintiffs do not challenge the City voters' power to utilize, as electoral districts, either the City as a whole or its wards. Plaintiffs also cannot possibly complain that they are harmed by the City's general elections, since all City voters can vote for all council members in that election. Thus, Plaintiffs have no basis to seek injunctive relief regarding the City's general election. The only remaining question is whether the City must use the same residency requirements/electoral jurisdiction for its primary and general elections. The answer to that question, based on the law cited above, is clearly "no."

Plaintiffs claim that the City must utilize one or the other of these electoral districts in both its primary and general elections, or be subject to strict scrutiny across the two different

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

elections. But, the well settled law regarding City powers over election residency and geography calls for a rational basis standard, does not allow for strict scrutiny across two different elections, and supports the City's sovereign ability to utilize its current system, which creates different residency requirements (and thus electoral jurisdictions) for the primary and general elections. Nothing in the Fourteenth Amendment creates a right to have the same residency requirement or geographic unit in two different elections.

**III. The City's primary and general elections are separate and distinct elections, for which the City may use different residency requirements.**

Given City voters' plenary powers over the structure of their elections under the Charter, Plaintiffs may argue that the City's separate and distinct primary and general elections should be treated as a "single election." *See* Mot. at 9. But again, federal and Arizona precedent contradicts such a claim. The primary election system as practiced in Arizona is a nominating device substituting for party caucuses and conventions. *Board of Sup'rs of Maricopa County v. Superior Ct.*, 4 Ariz. App. 110, 111, 417 P.2d 744, 745 (1966). The primary serves a different and much more limited function than the general election:

> [T]he primary election serves a different function in our system. It is a competition for the party's nomination, no more, no less, and does not elect a person to office but merely determines the candidate who will run for the office in the general election. …. In contrast, a general election actually determines which candidate will hold the office.

*Kyle v. Daniels*, 198 Ariz. 304, 306 ¶ 10, 9 P.3d 1043, 1045 (2000) (citation omitted).

Federal courts have come to the identical conclusion. "[Primaries] are in no sense elections for an office but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921). "The nomination by a political party, whether by caucus, convention, or primary, is nothing more than an indorsement and recommendation of the nominee to the suffrage of the electors at large." *United States v. O'Toole*, 236 F. 993, 995 (S.D. W.Va. 1916) *aff'd sub nom. United States v. Gradwell*, 243

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

U.S. 476 (1917). Thus, a primary can be an "election" for purposes of Article I, § 4 of the Constitution, *United States v. Classic*, 313 U.S. 299, 316-21 (1941), and prevention of racial discrimination, *Smith v. Allwright,* 321 U.S. 649, (1944), and an "integral part of the entire election process," *Storer v. Brown*, 415 U.S. 724, 735 (1974). But the primary is simply the first of two "steps" or the "initial stage in a two-stage process," and thus distinct from the general election. *Classic*, 313 U.S. at 316-17; *Storer*, 415 U.S. at 735.

> If it be practically true that under present conditions a designated party candidate is necessary for an election—a preliminary thereto—nevertheless his selection is in no real sense part of the manner of holding the election. This does not depend upon the scheme by which candidates are put forward. Whether the candidate be offered through primary, or convention, or petition, or request of a few, or as the result of his own unsupported ambition does not directly affect the manner of holding the election.

*Newberry*, 256 U.S. at 257. Thus, a primary is an election separate and distinct from the general election, producing only a party endorsement rather than an elected official, and therefore subject to conditions separate and distinct from those for the general election:

> In passing statutes regulating primary elections, a state recognizes the important fact that candidates go into the general elections with indorsements of political parties, *and it merely provides the conditions upon which that indorsement is to be received*.

*O'Toole*, 236 F. at 995 (emphasis added).

But the City's power to set "conditions" for a "distinct" primary[4] brings us right back to the City's plenary power over elections, ability to create different residency qualifications for the primary election than exist for the general election, and sovereign ability to utilize its fully constitutional current system. *See* Section II above.

---

[4] The City's voters need not allow primaries at all, *American Party of Texas v. White*, 415 U.S. 767, 781-82 (1974), and having chosen to do so, the rationality of their residency requirements/electoral boundaries for that primary can rest on benefiting themselves as well as the parties. *See Burdick*, 504 U.S. at 439 (state's actions benefited both public and parties).

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

**IV. Because Plaintiffs' Federal Equal Protection Claim Fails, Their State Claims Also Fail.**

"The equal protection clauses of the 14th Amendment and the state constitution have for all practical purposes the same effect." *Valley Nat'l Bank of Phoenix v. Glover,* 62 Ariz. 538, 554-55 (1945); *Standhardt v. Superior Ct. ex rel. County of Maricopa*, 206 Ariz. 276, 289 ¶ 42 n. 19, 77 P.3d 451, 464 (App. 2003) ("this clause provides the same benefits as its federal counterpart"). Since Plaintiffs' federal equal protection claim is meritless, so is their state "equal privileges and immunities" claim under Article 2, § 13 of the Arizona Constitution. Likewise, the "free and equal" elections clause, ARIZ. CONST. Art. 2, § 21, only protects Plaintiffs against what is ***not*** occurring here, namely voter discrimination within a particular election district during a given election. It has no effect on the City's plenary power to designate different residency requirements, and create different electoral jurisdictions, in its primary and general elections. This claim too fails.

**V. Preliminary Injunctive Relief Is Not Appropriate In This Case.**

Plaintiffs devote very little of their discussion to two key questions regarding whether the requested injunctive relief is appropriate in this case: [1] whether the balance of hardships sharply favors them; and [2] whether public policy favors the granting of relief. In fact, their arguments are conclusory at best, covering little more than a single page. *See* Mot. at 15-16. These issues are far more complicated and warrant much more attention.

First, it is critical to note that the ***preliminary*** relief that Plaintiffs seek is indistinguishable from the ***permanent*** relief they have requested. Both seek orders from the Court prohibiting the City from holding the 2015 primary and general election under the hybrid system mandated by Tucson Charter, Chapter XVI, § 9 and directing the City—pending an amendment to the Charter—to hold elections for open Council seats on either an entirely ward-based or an entirely at-large basis. *See* Compl. at 13-14; Mot. at 2, 17. Thus,

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

Plaintiffs seek a mandatory injunction forcing the City's Mayor and Council to choose between entirely ward-based or entirely at-large elections pending a charter amendment.

Per Plaintiffs, either entirely ward-based or entirely at-large elections are constitutional, and they "take no position on the normative question of which arrangement represents a preferable policy." *See* Mot. at 14. Thus, Plaintiffs would have the Court order the Mayor and Council select one of the two alternatives for the 2015 primary and general elections until the Charter can be amended. But under the Charter, Mayor and Council have no right to do so. The Charter may only be amended by a vote of the Tucson electorate. *See* CHARTER, Ch. XXVI, § 1; ARIZ. CONST., Art. 13, § 2. The Court does not have the power to order Defendants to violate the Charter by taking the decision out of the voters' hands.[5]

Plainly, as to the 2015 primary and general elections, Plaintiffs filed their lawsuit too late for the Court to determine the constitutionality of Charter Chapter XVI, § 9 and give Tucson's voters the opportunity to correct any constitutional infirmity found by the Court by having Defendants put to them the question of whether they want entirely ward-based or entirely at-large elections for Council seats. "Tucson has used this [hybrid] system since adopting its current city charter in 1929." *City of Tucson v. State*, 229 Ariz. 172, 173 ¶ 2, 273 P.3d 624, 625 (2012). And as alleged in their complaint and Motion, candidates have won Council seats in at-large elections despite losing in the ward from which they were nominated at least eight times *since 1991*. *See* Compl. ¶ 28; Mot. at 3. Further, the legal principles cited by Plaintiffs mainly come from cases decided many years ago. *See* Mot.

Finally, the August 25, 2015 primary election train has already left the station. *See* Randolph Decl. (attached hereto as Ex. A). Candidates have signed campaign contracts with

---

[5] Such an order would expose the Mayor, Council members, and the City Clerk to criminal sanctions, and interfere with the operation of city government. A violation of the Charter is, under Chapter XXV, § 5, a criminal offense (misdemeanor), or may be "redressed by civil action, at the option of the mayor and council." Also, for an elected official or appointive officer (which includes the City Clerk, Tucson's elections official), if he or she is convicted of a violation of the Charter, it causes a vacancy under Chapter VIII, § 3.

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

the City for public matching funds and begun planning their campaigns. *Id.* Postcards have already been mailed out to military and overseas voters, allowing unaffiliated voters to choose which partisan primary ballot they want to vote. *Id.* On May 24, the City will mail out similar postcards to voters resident in Tucson. *Id.* May 27 is the last day for candidates to file their nominating petitions. *Id.* On June 12, ballot proofs are due. On June 22, ballot printing begins. *Id.* On June 1, final artwork for the publicity pamphlet is due. *Id.* On July 11, ballots will be mailed to military/overseas voters and they may begin to return voted ballots immediately upon receipt. *Id.* And on August 5, ballots will be mailed to voters resident in Tucson and those voters may immediately return voted ballots. *Id.*

The Court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion." *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006). The Ninth Circuit has recognized that, even where the constitutional right is fundamental, "a federal court cannot lightly interfere with or enjoin a state election." *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Further, "[t]he decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation. *Id.*[6]; *Reynolds v. Sims,* 377 U.S. 533, 585 (1964) (even after a three-judge court found that a legislative apportionment plan violated the Constitution, the Supreme Court counseled against granting injunctive relief that would disrupt the election process). Other courts are in accord. *Chisom v. Roemer,* 853 F.2d 1186, 1189 (5th Cir. 1988) ("'intervention by the federal courts in state elections has always been a serious business,' not to be lightly engaged in").[7]

---

6 Citing *Ely v. Klahr,* 403 U.S. 108, 113 (1971); *Whitcomb v. Chavis,* 396 U.S. 1055 and 396 U.S. 1064 (1970); *Kilgarlin v. Hill,* 386 U.S. 120, 121 (1967) (per curiam).

7 Internal citations omitted and quoting *Oden v. Brittain*, 396 U.S. 1210 (1969) (Black, J., op. in chambers).

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C. 3507 NORTH CAMPBELL AVENUE, SUITE 111 TUCSON, ARIZONA 85719 520-320-1300

Courts require challenges to elections to be filed at such a time that injunctive relief will not unnecessarily disrupt the operation of government and disenfranchise voters:

> Unwarranted interference with the process of state elections is to be avoided. *Gjersten v. Board of Election,* 791 F.2d 472, 479 (7th Cir. 1986); *see Stevo v. Keith,* 546 F.3d 405, 409 (7th Cir. 2008) (warning "against federal judicial micromanagement of state regulation of elections"). The Court has an obligation to protect the "innocents ... who will be harmed if a last-minute injunction" disrupts the orderly administration of the upcoming election. *Nader v. Keith,* 385 F.3d 729, 737 (7th Cir. 2004).

*Summers v. Smart*, ___ F. Supp. 3d ___, 2014 WL 4124253 (N.D. Ill., Aug. 21, 2014). Thus, "[i]t is well established that in election-related matters, extreme diligence and promptness are required." *Justice v. Hosemann*, 829 F. Supp. 2d 504, 521 (N.D. Miss. 2011);[8] *cf. Reynolds,* 377 U.S. at 585 ("under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief").

Two cases are illustrative. In *Chisom v. Roemer*, black voters challenged Louisiana's system for electing state supreme court justices under the Voting Rights Act, and the district judge enjoined the election. Assuming that the plaintiffs had demonstrated the likelihood of their success on the merits, the Fifth Circuit disagreed. Noting that "[t]he core value of the law and its implementing judicial system is stability," the *Chisom* court found that enjoining the election would [1] "cast a cloud over the affected court";[9] [2] disenfranchise the voters; and [3] deny the state legislature the opportunity to correct the constitutional defect. *Id.*, 853 F.2d at 1191-92. As to the latter principle, the *Chisom* court stated:

---

8 Quoting *McClafferty v. Portage County Bd. of Elections,* 661 F. Supp. 2d 826, 839 (N.D. Ohio 2009).

9 The *Chisom* court noted the numerous issues that would be raised if the election was enjoined. For example, would the state supreme court have seven justices on January 1 of the following year? If the election was enjoined and a justice up for election continued to serve, would there be questions about the validity of the court's rulings? Would the justice seats up for election be deemed vacant and subject to appointment? *Id.*, 853 F.2d at 1190-92.

LAW OFFICES OF BOSSÉ ROLLMAN & FUNK P.C. 3507 NORTH CAMPBELL AVENUE, SUITE 111 TUCSON, ARIZONA 85719 520-320-1300

> [W]e are also keenly mindful of another well-established rubric which must be brought to bear in the resolution of the present conundrum. It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to either a federal constitutional or statutory requirement, *the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies*.

*Id.* at 1192 (emphasis added); *see also id.* (specifically noting that the Supreme Court in *Reynolds v. Sims* commended the district court for refraining from enjoining an impending election until the Alabama Legislature had been given an opportunity to remedy the defects in its legislative apportionment scheme) (citing *Reynolds*, 377 U.S. at 586). Thus, the Fifth Circuit held that the system in place should be left undisturbed for the upcoming election.

*United States v. Charleston County*, 318 F. Supp. 2d 302 (D.S.C. 2002), was a challenge to a county at-large voting system for electing county council members under the Voting Rights Act and the Fourteenth Amendment. The district court granted partial summary judgment on the merits in favor of the plaintiffs, but denied preliminary injunctive relief. It found that if it refused relief, the plaintiffs might have their votes diluted, but if it granted relief, *every voter* would be disenfranchised. *Id.* at 327. In addition, the county's and its county council's interest in maintaining the normal operation of county government would be harmed. *Id.*[10] Ultimately, the court balanced the hardships and considered public policy, and decided that injunctive relief was inappropriate:

> [C]onducting the election under the current at-large system will perpetuate any wrong which may exist.
>
> However, allowing the election to be held would allow the County to continue to function in an orderly fashion with County Council members who have a current interest in governing. It would be consistent with the strong public interest in having elections go forward and not impeding the power of local government to self-govern. It would essentially maintain the status quo pending a resolution of the issues herein. Most importantly it would preserve the right of the public at-large to vote. Under these circumstances, the court

---

[10] The court noted that the incumbent council members would be required to remain in office for an indefinite period of time or the county council would have to function with a smaller number of council members than necessary to conduct county business for the same indefinite period.

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

> would be ill-advised to engage in the serious business of intervening in local elections, and it is difficult to see how the public interest would be served by enjoining the elections. *Id.*

In summary, Plaintiffs waited too long. The Court lacks the power to force its Mayor and Council members to direct the City Clerk to conduct either an entirely ward-based election or entirely at-large election for Council seats in the absence of a vote by the Tucson electorate to go with one alternative other the other. And there is no way for Mayor and Council to put the issue to the voters in time for either the 2015 primary or general elections. The Court should find that the balance of hardships does not sharply favor Plaintiffs, and public policy disfavors the granting of the requested injunctive relief.

**CONCLUSION**

The Supreme Court provides an excellent final response to Plaintiffs' flawed claims and theories, in language written almost 170 years ago but still perfectly relevant today:

> And certainly it is no part of the judicial functions of any court of the United States to prescribe the qualification of voters in a State, giving the right to those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision.

*Luther v. Borden*, 48 U.S. 1, 41 (1849). Plaintiffs' Motion for Preliminary Injunction should be denied, and their Complaint dismissed under either FED. R. CIV. P. 12(b)(6) or 56.

RESPECTFULLY SUBMITTED on April 29, 2015.

BOSSÉ, ROLLMAN & FUNK P.C.

By: /s/ Richard A. Brown
Richard M. Rollman
Richard A. Brown
Attorneys for Defendants

LAW OFFICES OF
BOSSÉ ROLLMAN & FUNK
P.C.
3507 NORTH CAMPBELL AVENUE, SUITE 111
TUCSON, ARIZONA 85719 520-320-1300

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 29, 2015, I electronically transmitted the attached document to the Clerk's Office on using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kory A. Langhofer
Thomas J. Basile
BROWNSTEIN HYATT FARBER SCHRECK, LLP
Suite 2400
One East Washington Street
Phoenix, Arizona 85004
klanghofer@bhfs.com
tbasile@bhfs.com
Attorneys for Plaintiff

By: /s/ Bille Jo Labby