Kory A. Langhofer – 024722
klanghofer@bhfs.com
Thomas J. Basile – 031150
tbasile@bhfs.com
**BROWNSTEIN HYATT FARBER SCHRECK, LLP**
One East Washington Street, Suite 2400
Phoenix, Arizona 85004
Telephone: 602.382.4040
Facsimile: 602.382.4020

*Attorneys for the Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Public Integrity Alliance, Inc., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>City of Tucson, *et al.*,<br><br>Defendants. | No. 4:15-cv-00138-CKJ<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** |

The fundamental rule is this: "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).

Here, the parties apparently agree that the "geographical unit" in this case is the City as a whole; in their brief, the Defendants concede "that because they are ultimately selected in an at-large election in which all qualified electors of the City are eligible to participate, 'Tucson council members, although nominated by ward, represent the entire city.'" Opp. at 3 (quoting *City of Tucson v. State*, 273 P.3d 624, 631 (Ariz. 2012)).[1] Accordingly, each voter in the City has a Fourteenth Amendment right to participate

---

[1] As a consequence of the Defendants' admission on this point, resolution of the Motion should be grounded entirely in Count I of the complaint (*i.e.*, denial of the right to vote in primary elections), which is premised on assumption that each Council member represents the entire city. By contrast, Count II (*i.e.*, dilution of the right to vote), which pleaded an alternative theory of relief, presupposed that each Council member was the representative only of his or her ward.

equally in all aspects of City Council elections – including primary elections – regardless of the voter's ward of residence.

The City's unequal treatment of voters within the "geographical unit" based on the voters' ward of residence is not narrowly tailored to serve a compelling governmental interest – and therefore violates the Fourteenth Amendment of the U.S. Constitution.

I.   **The "Geographical Unit" Is Fixed Throughout an Entire Election Cycle**

Defendants have argued that "[n]othing in the Fourteenth Amendment creates a right to have the same residency requirement or geographic unit" in both primary and general elections for the same office.  *See* Opp. at 10.

That assertion is incorrect.  Under the U.S. Supreme Court's decision in *Gray*, the "geographical unit" in a voting rights case is fixed; specifically, it is the unit "for which a representative is to be chosen." 372 U.S. at 379.  By rendering City Council positions subject to a citywide vote, the City Charter designates each Council member a representative of the entire city – a proposition apparently accepted by the Defendants.

Carried to its logical conclusion, the Defendants' position – *i.e.*, that the government may vary the "geographical unit" for the same office within a given election cycle – would permit the Arizona State Legislature to abolish statewide primary elections in gubernatorial races, replacing them with primary elections in which a voter may participate only if the voter resides in a gubernatorial candidate's legislative district. *Gray* prohibits such burdens on equal voting rights by requiring a static geographical unit for all primary, general, and runoff elections in a given election cycle.

II.   **The Equal Protection Clause Applies with Full Force in Both the Primary and General Elections**

The Defendants argue that a relaxed form of Equal Protection analysis should apply because the primary election is simply a "nominating device" and a different "election." *See* Opp. at 10.  Doctrinally, this supposition is clearly incorrect.

    **A.   Primary and General Elections Are of Equal Constitutional Dignity**

Defendants appear to suggest that because a partisan primary "is simply the first of

2

two 'steps' or the 'initial stage in a two-stage process," *see* Opp. at 11, burdens on the primary electorate are subject to lesser constitutional scrutiny.  The federal cases Defendants cite for this proposition – most of which are nearly a century old – embody an anachronistic conception of nominating processes that subsequent cases have decisively repudiated.  Under modern voting rights jurisprudence, "the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election." *See Smith v. Allwright*, 321 U.S. 649, 664 (1944); *Bullock v. Carter*, 405 U.S. 134, 146-47 (1972) (subjecting candidate filing fee that applied only to the primary election to heightened scrutiny); *cf. Morse v. Republican Party of Va.*, 517 U.S. 186 (1996) (holding that delegate filing fee at political party's nominating convention was state action and could constitute an impermissible poll tax under the Voting Rights Act).[2]

### B. Whether the Primary Is a Separate "Election" Is Immaterial

Defendants also reason that the primary is a "separate and distinct" election "and therefore subject to conditions separate and distinct from those for the general election." *See* Opp. at 11.

The Supreme Court disagrees.  Its longstanding position that limitations on primary voting are as constitutionally significant as restrictions impairing the general election franchise is founded in a recognition that voters' choices in the general election are profoundly intertwined with, and often conditioned on, the primary process. *See United States v. Classic*, 313 U.S. 299, 318 (1941) ("[T]his right of participation [in the nominating process] is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative."); *Bullock*, 405 U.S. at 146-47 (rejecting

---

[2] The Arizona Supreme Court case cited by Defendants, *Kyle v. Daniels*, 9 P.3d 1043 (Ariz. 2000), featured solely a question of statutory interpretation; the court never opined on the constitutional significance of nominating contests as distinguished from the general election.

argument that filing fee's application only to the primary mitigated the constitutional injury, noting that "the primary election may be more crucial than the general election" in deciding electoral outcomes).

More fundamentally, whether the primary and general are more accurately characterized as a unitary election or separate contests has no bearing on this dispute. As discussed above, the City's Equal Protection obligations are denoted by reference to the relevant "geographical unit," which is in turn the constituency "for which a representative is to be chosen." In other words, the "geographical unit" is tethered to the *office* to be elected, not the timing of the election (*i.e.*, a primary versus a general).

A hypothetical illustrates the point well: Suppose a state were to enact a law providing that only half of the state's congressional districts could participate in every other primary election for U.S. Senate seats, while keeping the general election open to a statewide electorate. Under the Defendants' reasoning, such a restriction would be a valid exercise of the state's putative prerogative to unilaterally designate different "geographical units" for different "elections." Such an arrangement, however, is dissonant with even every intuitive understanding of Equal Protection, and is wholly irreconcilable with modern voting rights doctrine.

### III. The Hybrid System Is Not a Mere "Residency Requirement" Because It Discriminates *Among* Residents of the Geographical Unit

The Defendants recast the vote denial in primary elections as a mere "voter residency qualification," and thus subject only to rational basis review. *See* Opp. at 7.

Critically, the Defendants conflate residency requirements that distinguish among citizens in <u>different geographical units</u> with discrimination among voters based on their location of residence <u>within the same geographical unit</u>.[3] Plaintiffs agree that laws

---

[3] Although the Supreme Court has countenanced intra-unit residency requirements for *candidates*, it expressly cautioned that "different conclusions might follow" when such restrictions are invoked with respect to "voting or representation" rather than "merely the basis of residence for candidates." *Dusch v. Davis*, 387 U.S. 112, 115-16 (1967). In this vein, courts consistently have sustained durational residency requirements for candidates that would be unconstitutional if applied to voters. *See, e.g.*, *Lewis v. Guadagno*, 445 F. App'x 599, 603 (3d Cir. 2011) (upholding four-year residency

4

conditioning the franchise on an individual's residence in the geographical unit and defining what constitutes "residency" are generally entitled to judicial deference. Indeed, state and local governments possess considerable latitude in delineating initial jurisdictional boundaries and the geographic constituency for a given office.

As discussed above, however, the City has chosen instead to provide for citywide general elections, thereby rendering each Council member a representative of every Tucson resident. *See* Opp. at 3. By adopting that model, the City is constitutionally bound to ensure the equal treatment of <u>all</u> Tucson residents in <u>all</u> facets of the electoral process. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 n.78 (1973) (noting "the protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters"). Because "there is no indication in the Constitution that homesite . . . affords a permissible basis for distinguishing between qualified voters within" the geographical unit, *Gray*, 372 U.S. at 380, discrimination among voters based on their location <u>within</u> the city – even if characterized as a routine "residency requirement" – constitutes precisely the sort of Equal Protection violation proscribed by *Gray*.

Indeed, a glance at other areas of voting rights law quickly reveals the defense of "residency requirements" to be overly simplistic. Under Defendants' reasoning, all redistricting decisions could be conceptualized as merely differentiating among voters based on the location of their residence and thus subject only to rational basis review. Recognizing that redistricting bears directly on Equal Protection guarantees, however, the Supreme Court has consistently subjected discriminatory and dilutive redistricting schemes to strict scrutiny. *See generally Reynolds v. Sims*, 377 U.S. 533 (1964); *Green v. City of Tucson*, 340 F.3d 891, 900 (9th Cir. 2003) (noting that "regulations that contravene the principle of 'one person, one vote'" are *per se* strictly scrutinized). The mere fact that a voting requirement is tied to voter residency is not, as a matter a law, an

---

requirement for candidates, noting that "the Supreme Court has rejected the argument that an individual has a fundamental right to candidacy")

entitlement to rational basis review.

## IV. The Secession Cases Are Inapposite

Defendants rely heavily on the Tenth Circuit's decision in *City of Herriman v. Bell*, 590 F.3d 1176 (10th Cir. 2010), in support of their contention that the Hybrid System's restrictions are merely "residency requirements" subject to rational basis review. This invocation of *Herriman*, however, is misplaced for at least three reasons. **First**, *Herriman* actually reiterated the precept enunciated in *Gray* and its progeny, *i.e.*, that "[w]hen a state law discriminates among eligible voters within the *same* electoral district, strict scrutiny applies, and compelling governmental interests must justify restrictions on the franchise." *Id.* at 1185-86. **Second**, "[t]he equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives . . . are of limited relevance . . . in a 'single-shot' referendum," such as in *Herriman*. *See id.* at 1187 (quoting *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 266 (1977)). **Third**, and most significantly, cases featuring annexation or secession measures are *sui generis*, and not probative of the equal protection obligations entailed in candidate elections. Annexation and secession are exercises in dissolving existing geographical electoral units and constituting entirely new ones, and thus are intrinsically different from the Equal Protection applicable to static geographical boundaries. Further, to the extent an analogy can be forged, *Herriman* decidedly does not license a *carte blanche* prerogative to declare different geographical units for the same office representing the same constituency. Indeed, *Herriman* held merely that the vote on a proposed secession from an existing school district could be limited to those who would be residing in the new breakaway district – *i.e.*, those who would live in the new geographical unit for which new school board representatives would be chosen – a holding consonant with *Gray*.

## V. The Protectorate Cases Are Inapposite

For similar reasons, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978), in which the Supreme Court held that residents of an unincorporated area outside the

BROWNSTEIN HYATT FARBER SCHRECK, LLP
One East Washington Street, Suite 2400
Phoenix, AZ 85004

6

boundaries of Tuscaloosa did not have a constitutional right to vote in city elections despite being subject to municipal laws, does little to illuminate the issues in this case.

Doctrinally, *Holt* and other cases involving narrow "protectorate" authority stand for the proposition that, in very rare instances, the geographical unit that elects a body (and within which voting rights must be equal) may be narrower than the elected body's territorial jurisdiction or authority. Cases denying the franchise in presidential elections to residents of U.S. territories or protectorates, for example, reflect the critical distinction between the jurisdictional reach of an elected body's laws from the geographical unit that elects the body. *See, e.g., Attorney Gen. of Territory of Guam on Behalf of All U.S. Citizens Residing in Guam Qualified to Vote Pursuant to Organic Act v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984); *Igartua De La Rosa v. United States*, 229 F.3d 80, 83 (1st Cir. 2000).[4]

By contrast, once a city designates a representative for a given constituency, all eligible voters residing within that geographical unit must be permitted to participate in all aspects of the electoral process on equal terms. *See Hussey v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995) ("[O]nce citizens are granted the right to vote on a matter, the exercise of that vote becomes protected by the Constitution even though the state was not obliged to allow any vote at all."); *see also Mixon v. State of Ohio*, 193 F.3d 389, 405 (6th Cir. 1999) ("If the municipal school boards [which represented both Cleveland and its surrounding suburbs] were elected bodies and only the Cleveland residents could vote in the school board election, the relevant geographical entity would be the municipal school district" and strict scrutiny would apply to any exclusion of suburban voters.).

---

[4] Although the federal protectorate cases were resolved on Article II grounds rather than the plaintiffs' Equal Protection Clause claims, the dispositions implicitly incorporate a conclusion that the relevant geographical unit for Equal Protection purposes is not the geographical ambit over which federal authority extends. *See Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 600 (1976) ("It is clear…that the protections accorded by either the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply to residents of Puerto Rico.").

Wards Two through Six in the City of Tucson are plainly not protectorates of Ward One; the City Council member from Ward One does not simply have authority over Wards Two through Six – she actually is elected by and represents them.  The Hybrid System's denial of voting rights to Wards Two through Six therefore cannot be justified by the narrow line of cases limiting voting rights in protectorate jurisdictions.

## VI.     Preliminary Relief Will Not Prejudice the Defendants

Because "constitutional violations . . . generally constitute irreparable harm," *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009), the denial of injunctive relief must be predicated on specific and significant countervailing prejudice to the government or public at large.  *See Barr v. Galvin*, 584 F. Supp. 2d 316, 321 (D. Mass. 2008) ("With respect to the balancing of the harms, the deprivation of ballot access to the plaintiffs is a harm at least as great as, and probably greater than, any potential harm to the government's responsibility to ensure an orderly election.").

All the putative harms averred by the City either are purely speculative or would result only in relatively minor logistical or monetary expenses that are insufficient to overcome the equitable imperatives weighing in favor of injunctive relief.

**First**, election litigation is almost invariably expedited; inconvenience and urgency are not valid defenses.  *See Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008) (acknowledging that "[e]lection cases are difficult.  The historical background for such litigation changes rapidly"); *Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) (granting preliminary injunction shortly before presidential election).

**Second**, the first material deadline in connection with the August 2015 primary election is not until **June 12, 2015**, which Defendants aver is the date by which the form of the ballot must be finalized and provided to the printing vendor.  *See* Randolph Decl. ¶ 7.  This case – which the parties agree presents only questions of law amendable to summary resolution – easily can be decided by this Court, with ample time for an expedited appeal to the Ninth Circuit, well before June 12.[5]  Defendants state that notices

---

[5]     The City Clerk posits a series of additional deadlines in July and August, but this

of the August primary must be issued via mail no later than May 24, 2015, but acknowledge that these notices will be sent to <u>all</u> City voters in any event as a result of the citywide mayoral race. *See id.* ¶ 6. Accordingly, the issuance of an injunction would not cause Defendants to incur costs associated with the printing and dissemination of additional notices, nor would it prejudice any City voters, all of whom already will have received notice of the August election.[6]

**Third**, the May 27, 2015 deadline for candidates to file nomination petitions likewise would be unaffected by the issuance of a preliminary injunction. Defendants suggest that "[i]f the primary election is changed to an at-large election, the number of nominating petition signatures that a candidate must obtain will change." Randolph Decl. ¶ 15. Plaintiffs have never challenged the City's enactments governing petition signatures, and believe that any court-ordered equitable relief need not and should not impact the applicability of nomination petition requirements relied upon by candidates in the 2015 cycle. Further, any complications associated with petition signatures thresholds can be averted by conducting the 2015 general elections on a ward-only basis.

**Fourth**, Defendants contend that "[i]f the primary election is changed to an at-large general election, the City would be required to pay significantly more matching funds to the candidates than it has budgeted for." Randolph Decl. ¶ 14. As an initial matter, the City has not proffered any factual or legal explanation for why and in what amount its costs will increase. *Cf. Husted*, 697 F.3d at 435 ("[T]he State has not shown that it would be burdensome to extend early voting to all voters. Its argument to the contrary is not borne out by the evidence"). In addition, even if the added financial imposition outweighs Plaintiffs' constitutional interests (which is a dubious supposition),

---

case (to include any expedited appeal) can be adjudicated well before those dates elapse.

[6]  For the same reason, the passage of the City's April 27, 2015 deadline for sending notices to the uniformed services voters and overseas voters is immaterial. The City Clerk's declaration acknowledges that by virtue of the citywide mayoral election on the ballot, the notices were sent to all such UOCAVA voters irrespective of their ward of residence. Thus, the entry of preliminary relief will not prejudice any military or overseas electors.

9

the costs apparently can be avoided by holding ward-only general elections in November 2015.

**Fifth**, the Defendants speculate that the Green Party may be prejudiced by a switch to ward-only general elections, but acknowledge that "[n]o Green Party candidate has filed a statement of organization or given any indication that he or she intends to attempt to appear on the primary ballot." Randolph Decl. ¶ 16. Such conjectural ruminations are insufficient to overcome Plaintiffs' significant equitable interests in injunctive relief. *See Husted*, 697 F.3d at 435.

**Sixth**, the Defendants hypothesize that certain unaffiliated voters "might choose a different partisan ballot if both the primary and general elections are conducted on an at-large basis." Randolph Decl. ¶ 17. Again, however, mere surmise cannot forestall the enjoining of an unconstitutional law. *See Husted*, 697 F.3d at 435. Even if the City's speculation were corroborated, any putative prejudice easily could be mitigated by holding ward-only general elections in November.

**Finally**, even if the Defendants had provided adequate grounds for averting injunctive relief in connection with the primary election, they have articulated no valid laches defense in connection with the general election in November 2015. In this vein, if the City proceeds with ward-only primary elections in August, this Court should order it to similarly conduct the general election on a ward-only basis.

## VII. This Court Has Authority to Issue Injunctive Relief

Lastly, Defendants oppose entry of an injunction on the surprising theory that "[t]he Charter may only be amended by a vote of the Tucson electorate…The Court does not have the power to order Defendants to violate the Charter by taking the decision out of the voters' hands." *See* Opp. at 13. Thus, Defendants appear to posit that even if the Court deems the Hybrid System unconstitutional, it lacks authority to remedy the Equal Protection injury unless and until Tucson voters approve an amendment to the Charter.

This argument is thoroughly inconsistent with foundational principles of judicial review; if the availability of recourse through political channels divests courts of

authority to furnish remedial relief, then no unconstitutional statute or ordinance could ever be enjoined – a patently untenable conclusion. *See Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000) ("Once a constitutional violation has been found, a district court has broad powers to fashion a remedy.").[7]

Further, while Defendants rely heavily on cases underscoring the gravity of injunctions that **cancel** or **postpone** an election, the nature of the relief requested here is far more modest and narrowly tailored. Plaintiffs seek only an order providing that the primary and general elections be conducted on the same terms and open to the same electorates; such an injunction will neither delay nor encumber the electoral process, but rather will only ensure that every elector is accorded his or her constitutional right to an equal and undiluted vote. *See Krieger v. City of Peoria*, 2014 WL 4187500, at *6 (D. Ariz. Aug. 22, 2014) ("The balance of equities tips in favor of Plaintiffs, who are likely to suffer a serious violation of their constitutional rights, not in favor of Defendants, who seek to implement an election procedure that is fundamentally unfair."); *Doe v. Walker*, 746 F. Supp. 2d 667, 683 (D. Md. 2010) (extending deadline for UOCAVA ballots, reasoning that "[t]hough the Court is reluctant to interfere with Maryland's election machinery, where the risk of disenfranchisement of a group of voters is as great as it is in this case, narrowly tailored injunctive relief is warranted").

## CONCLUSION

For the reasons cited herein and in Plaintiffs' Motion, this Court should grant a preliminary injunction that (1) prohibits the Defendants from enforcing or relying upon Chapter XVI, Section 9 of the Tucson City Charter in connection with the 2015 Tucson City Council elections and any future election for that office, and (2) provides that, pending an amendment to the Tucson City Charter that is consistent with the United States and Arizona Constitutions, all primary and general elections for Tucson City Council must be conducted on either an entirely ward-based or an entirely at-large basis.

---

[7] To be sure, the Court can couple its issuance of a preliminary injunction with an order providing that the City place on the ballot a measure by which Tucson voters may select a new system for electing the City Council going forward.

11

RESPECTFULLY SUBMITTED this 5th day of May, 2015.

>BROWNSTEIN HYATT FARBER SCHRECK, LLP
>
>By: *s/ Kory A. Langhofer*
>      Kory A. Langhofer
>      Thomas J. Basile
>      One East Washington Street, Suite 2400
>      Phoenix, Arizona 85004
>      *Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on May 5, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Richard M. Rollman
Richard A. Brown
Bosse Rollman & Funk
3507 North Campbell Avenue, Suite 111
Tucson, Arizona 85719
rollman@bossefunklaw.com
brown@bossefunklaw.com

Michael G. Rankin
Dennis McLaughlin
Office of the Tucson City Attorney
P.O. Box 27210
Tucson, Arizona 85726-7210
mike.rankin@tucsonaz.gov
dennis.mclaughlin@tucsonaz.gov

☒ I hereby certify that on May 5, 2015, I served the attached document by FedEx on the following:

Honorable Cindy K. Jorgenson
United States District Court
Evo A. DeConcini U.S. Courthouse
405 West Congress Street, Suite 5180
Tucson, AZ 85701-5052

By    *s/ Donna Razo*