1    **WO**

2

3

4

5

6

7    **IN THE UNITED STATES DISTRICT COURT**

8    **FOR THE DISTRICT OF ARIZONA**

9

10   PUBLIC INTEGRITY ALLIANCE            )
     INCORPORATED, et al.                 )
11                                        )        No. CV 15-138-TUC-CKJ
           Plaintiffs,                    )
12                                        )        **ORDER**
     vs.                                  )
13                                        )
     CITY OF TUCSON, et al.,              )
14                                        )
           Defendants.                    )
15   _____  )

16         Pending before the Court is the Motion for Preliminary Injunction (Doc. 3) filed by

17   Plaintiffs.  Oral argument was presented to the Court on May 8, 2015, and the parties agree

18   this matter is presented for final disposition, including a requested permanent injunction.  For

19   the reasons discussed herein, Plaintiffs' requested relief is denied.

20

21   I.  *Factual and Procedural History*

22         The facts in this case are undisputed.  The City of Tucson ("the City" or "Tucson")

23   is divided into six wards composed of substantially equal populations.  One seat on the

24   six-member Tucson City Council ("Council") is allotted to each ward.  A candidate for the

25   Council must reside in the ward from which he or she seeks to be nominated.  The four-year

26   terms of the Council members are staggered, and elections are held on biennially in

27   odd-numbered years.

28

1    A partisan primary is conducted each August of an election year in each ward whose

2  Council seat is up for election.  One nominee from each recognized political party is selected.

3  Each ward's primary election is limited only to registered voters who reside within that ward;

4  otherwise qualified electors who reside in other wards of the City may not participate in the

5  ward's primary election.

6    The candidates nominated in the ward-based primaries then compete in an at-large

7  election held in November of the election year in which all qualified electors in the City may

8  participate.  Every qualified elector may select one candidate for each of the Council seats

9  appearing on the ballot.  The nominees compete in the general election only against other

10  candidates nominated in the same ward.  This election procedure will be referred to as the

11  Hybrid System.  "Tucson has used this [hybrid] system since adopting its current city charter

12  in 1929." *City of Tucson v. State*, 229 Ariz. 172, 173 ¶ 2, 273 P.3d 624, 625 (2012); *see also*

13  Tucson City Charter, Chapter XVI, § 9.

14    On at least eight occasions since 1991, a candidate has won election to the Council

15  in the at-large general election despite failing to carry the ward in which he or she resided

16  and from which he or she had been nominated.

17    On April 6, 2015, Plaintiffs Public Integrity Alliance, Inc. ("Alliance"), Bruce Ash,

18  an individual who is expected to be an elector in Tucson Ward 2 during the 2015 elections,

19  Fernando Gonzales, an individual who resides in Tucson Ward 1, Ann Holden, an individual

20  who resides in Tucson Ward 3, Lori Oien, an individual who resides in Tucson Ward 2, and

21  Ken Smalley, an individual who resides in Tucson Ward 6 (collectively "Plaintiffs") filed a

22  Complaint against the City and Tucson officials (collectively, "Defendants").  Plaintiffs

23  allege the Hybrid System deprives them of the right to vote (Count I), dilutes them of the

24  right to vote (Count II) pursuant to the U.S. Const. Amend. XIV § 1 (Equal Protection

25  Clause), and denies them of equal privileges or immunities (Count III) pursuant to the Ariz.

26  Const. Art. II, § 13.  Plaintiffs also allege the Hybrid System violates the Free and Equal

27

28

Elections Clause of the Arizona Constitution (Count IV).  Ariz. Const. Art II, § 21.[1] Defendants have filed an Answer.

Also, on April 6, 2015, Plaintiffs filed a Motion for Preliminary Injunction (Doc. 3). Defendants have filed a Response and a Supplemental Citation of Authority.  Plaintiffs have filed a Reply.  Plaintiffs have also filed a Supplemental Authority.

II.  *Equal Protection Clause*

"'The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.'"  *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014), (*quoting  City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *see also  Lawrence v. Texas*, 539 U.S. 558 (2003) (O'Connor, J., concurring in the judgment)).  "The equal protection clauses of the 14th Amendment and the [Arizona] constitution have for all practical purposes the same effect."  *Vong v. Aune*, 235 Ariz. 116, 123 (App. 2014) (*quoting Valley Nat'l Bank of Phx. v. Glover*, 62 Ariz. 538, 554 (1945)).

III.  *Review of Claim that the Hybrid System Deprives Plaintiffs of the Right to Vote*

The Tucson City Charter provisions at issue in this case set forth the election procedures for Council members.  When a regulatory burden on voting rights is "severe," "it must be 'narrowly drawn to advance a state interest of compelling importance.'"  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal citation omitted).  However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.* (internal citation omitted).

---

[1]In their Reply, Plaintiffs assert Defendants have conceded the relevant geographical unit is the City as a whole.  Therefore, Plaintiffs assert Count I, denial of the right to vote, as opposed to Count II, dilution of the right to vote, is at issue in this case.

A. *Discussion of Applicable Legal Principles*

It is only when the primary and the general election are viewed together does the equal protection argument raised by Plaintiffs become an issue.  Defendants assert the primary election only produces a party endorsement rather than an elected official:

> If it be practically true that under present conditions a designated party candidate is necessary for an election—a preliminary thereto—nevertheless his selection is in no real sense part of the manner of holding the election. This does not depend upon the scheme by which candidates are put forward.  Whether the candidate be offered through primary, or convention, or petition, or request of a few, or as the result of his own unsupported ambition does not directly affect the manner of holding the election.

*Newberry v. United States*, 256 U.S. 232, 257 (1921).  Indeed "[primaries] are not an election for an office but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors."  *Id.* at 250. Defendants assert "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," *Carrington v. Rash*, 380 U.S. 89, 91 (1965), and may "impose voter qualifications and regulate access to the franchise in other ways."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  While there is a distinction between primary and general elections, by choosing to nominate candidates through a primary election, *see e.g.*26 Am. Jur. 2d Elections § 223 (Feb. 2015) ("While states may require that political parties select their candidates for general election through a primary, such contests are not mandated by the First Amendment to the Federal Constitution[.]"), the electoral procedure "must pass muster against the charges of discrimination or of abridgment of the right to vote[.]"  *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969) (addressing the use of nomination petitions by independent candidates).

Plaintiffs point out that the right to vote guarantees that "[o]nce a geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963); *see also Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Plaintiffs assert that, because Tucson council members represent the entire City, *City of Tucson v. State*, 273 P.3d 624, 631 (Ariz. 2012), the City, as the corresponding geographic

1  area, is the applicable unit for assessing equal protection challenges.[2]   Additionally,
2  Plaintiffs assert the constitutional infirmity is not corrected by future staggered elections
3  cancelling out equal protection violations:  the denial of the right to vote from a resident of
4  a ward because in two years that resident will be able to cast a vote when others residents
5  will not be able to (based on which ward the residents reside in) is unconstitutional.
6  *Montano v. Lefkowitz*, 575 F.2d 378, 387 n.15 (2d Cir. 1978); *Ayers-Schaffner v. DiStefano*,
7  37 F.3d 726, 731 n.5 (1st Cir. 1994).  Because the Tucson City Charter grants the right to
8  vote to some residents and denies the franchise to others, Plaintiffs assert a strict scrutiny
9  review is appropriate.  *See e.g. Green*, 340 F.3d at 896 (in discussing equal protection clause
10 challenge to legislation, the court, "where the statute in question substantially burdens
11 fundamental rights, such as the right to vote . . . strict scrutiny applies and the statute will be
12 upheld only if the state can show that the statute is narrowly drawn to serve a compelling
13 state interest").

14        Defendants assert the restriction in this case is a residency requirement and residency
15 requirements based on those boundaries are subject to a rational basis scrutiny.[3]  Defendants
16 point out that "[s]tates have considerable leeway in discriminating against voters residing in
17 different governmental units or electoral districts even when the outcome of a particular
18 election affects them."  *City of Herriman v. Bell*, 590 F.3d 1176, 1186 (10th Cir. 2010).
19 Further, Defendants assert that courts generally defer to different boundaries drawn for
20 voting purposes by a governmental entity if the separate units further reasonable government
21 objectives."  *Id*. at 1185.  Indeed, the "Supreme Court has consistently upheld laws that give
22 different constituencies different voices in elections[.]"  *Id*. at 1184.  However, the court
23 clarified that statement by recognizing that principle especially applied in those situations

24  _____

25       [2]Plaintiffs also argue that a constitutional violation occurs if the ward is considered
    the electoral geographic unit.  Plaintiffs, in their reply, focus their claim on Count I of the
26  Complaint (denial of the right to vote in primary elections), because Defendants have not
    disputed that the relevant geographical unit in this case is Tucson as a whole.
27

28       [3]The geographical units for Tucson's elections are created by designating the
    geographical boundaries of the election jurisdiction to be used for each election.

1   "involving the annexation or adjustment of political boundaries." *Id.*

2        Defendants also cite to *Stokes v. Fortson*, 234 F.Supp. 575 (D.C.Ga. 1964) in support

3   of their assertion that the procedure is constitutional.  *Stokes* involved a similar factual

4   situation regarding a judicial position.  That court stated:

5        In the first place, we are unable to discern any discrimination among voters or unequal
     weighting of votes of the sort condemned by the one man-one vote principle.  Indeed,
6        plaintiffs concede that there is no discrimination in either the nomination process or
     the election process considered separately.  The vote of each person in the statewide
7        election is equal; the electors of every judicial circuit are permitted to vote for the
     nominees from every judicial circuit.  Also, the vote of each person in the judicial
8        circuit is equal in the nominating process. [Footnote omitted.] Since every man's vote
     counts the same, the fact that the statewide electorate may override the choice of the
9        circuit in no way offends the principles of *Baker v. Carr* and its progeny.  *See Alsup
     v. Mayhall*, S.D.Ala., 1962, 208 F.Supp. 713.
10

11   234 F.Supp. at 577.  However, the *Stokes* decision and other similar cases cited by

12   Defendants in their Supplemental Citation of Authority distinguished the fact that the

13   election was for the judiciary rather than a legislative or executive official:

14        [E]ven assuming some disparity in voting power, the one man-one vote doctrine,
     applicable as it now is to selection of legislative and executive officials, does not
15        extend to the judiciary.  Manifestly, judges and prosecutors are not representatives in
     the same sense as are legislators or the executive. Their function is to administer the
16        law, not to espouse the cause of a particular constituency.  Moreover there is no way
     to harmonize selection of these officials on a pure population standard with the
17        diversity in type and number of cases which will arise in various localities, or with the
     varying abilities of judges and prosecutors to dispatch the business of the courts. An
18        effort to apply a population standard to the judiciary would, in the end, fall of its own
     weight.

19   *Id.*; *see also Holshouser v. Scott*, 335 F.Supp. 928 (D.C.N.C., 1971).  This emphasizes the

20   distinction of the elections of judges with those of representatives of a constituency.

21        Additionally, Plaintiffs disagree with Defendants' assertion that "[n]othing in the

22   Fourteenth Amendment creates a right to have the same residency requirement or geographic

23   unit" in both primary and general elections for the same office.  *See* Response, p. 10.

24   Plaintiffs argue that, under *Gray*, once the "geographical unit" in a voting rights case is fixed,

25   it is the unit "for which a representative is to be chosen."  372 U.S. at 379.  Indeed, the

26   Supreme Court has stated that "[t]he concept of political equality in the voting booth

27   contained in the Fifteenth Amendment extends to all phases of state elections . . . and, as

28   previously noted, there is no indication in the Constitution that homesite . . . affords a

1   permissible basis for distinguishing between qualified voters within the [geographical unit].

2   *Id*. at 380 (*citations omitted*).  Further, voting rights "must be recognized in any preliminary

3   election that in fact determines the true weight a vote will have." *Id*.  Therefore, it appears

4   the geographical unit is tethered to the office to be elected rather than the timing of the

5   election. *See e.g. Smith v.Allwright*, 321 U.S. 649, 660 (1944) *(United States v. Classic*, 313

6   U.S. 299 (1941) fused "the primary and general elections into a single instrumentality for

7   choice of officers").

8          However, in recognizing that the primary and general elections were fused, *Gray* did

9   not specify that corresponding primaries must necessarily be the same geographical unit as

10  a general election.  Rather, the Supreme Court's statement that the homesite does not afford

11  a permissible basis for distinguishing between qualified voters within a geographical unit was

12  made in discussing the value of a vote in an individual election – not a combined primary and

13  general election process.  Further, *Herriman*, *Stokes*, and similar cases recognize that

14  generally strict scrutiny does not "apply to voting restrictions based on voters' residency

15  outside the relevant electoral district."  590 F.3d at 1186.  However, these cases do not

16  address whether a primary and general election must have the same geographical unit when

17  the election is for a representative official.  Nonetheless, the Court finds these cases

18  instructive.  The *Stokes* court specifically found no discernable discrimination among voters

19  or unequal weighting of votes of the sort condemned by the one man-one vote principle.

20  Only when assuming some disparity in voting power did the court find the distinction

21  between the judiciary elections as opposed to legislative or executive elections significant.

22  Further, in general, laws that give different constituencies different voices in elections are

23  constitutional.  *Herriman*, 590 F.3d at 1184.

24         Plaintiffs acknowledge that the Supreme Court has held that county or city bodies

25  elected on an at-large basis but subject to district-based candidate residency requirements do

26  not implicate "one person, one vote" concerns, *Dallas Cnty. v. F.D. Reese*, 421 U.S. 477

27  (1975).  However, Plaintiffs argue that the Supreme Court has recognized that "different

28  conclusions might follow" if the districts served as "the basis . . . for voting or

representation," rather than merely the situs of candidates' residence. *Dusch v. Davis*, 387 U.S. 112, 115-16 (1967).   Defendants assert, however, that, in context, the Court was recognizing a hypothetical situation that could arise in which a general election system which is based on districts of unequal population could result in either unequal representation, *Reynolds v. Sims*, 377 U.S. 533 (1964); *Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 480 (1968), unequal weighting of votes, *Gray v. Sanders*, 372 U.S. 368, 379 (1963), or both.

While the *Dusch* Court was discussing varied populations, it did not discuss the contemporaneously developing principles of strict scrutiny and rational basis analyses.   The Supreme Court incorporated the district court's findings in its opinion:

> 'The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give due consideration to questions presented throughout the entire area.
>
> (T)he history—past and present—of the area and population now comprising the City of Virginia Beach demonstrates the compelling need, at least during an appreciable transition period, for knowledge of rural problems in handling the affairs of one of the largest area-wide cities in the United States. Bluntly speaking, there is a vast area of the present City of Virginia Beach which should never be referred to as a city. District representation from the old County of Princess Anne with elected members of the Board of Supervisors selected only by the voters of the particular district has now been changed to permit city-wide voting. The 'Seven-Four Plan' is not an evasive scheme to avoid the consequences of reapportionment or to perpetuate certain persons in office. The plan does not preserve any controlling influence of the smaller boroughs, but does indicate a desire for intelligent expression of views on subjects relating to agriculture which remains a great economic factor in the welfare of the entire population. As the plan becomes effective, if it then operates to minimize or cancel out the voting strength of racial or political elements of the voting population, it will be time enough to consider whether the system still passes constitutional muster.'

387 U.S. at 116-117.  The Supreme Court stated that the *Dusch* plan made "no distinction on the basis of race, creed, or economic status or location," 387 U.S. at 115, and determined the process was constitutional.

B. *Rational Basis Review*

Significant to this Court is that no court decision has determined that the same geographical unit must apply to corresponding primary and general elections.   Also significant is that, in every case in which courts have addressed the constitutionality of at-

large elections (and, where applicable, the primary elections corresponding to those at-large elections) the courts have determined that a rational basis review is appropriate. Moreover, the *Dusch* Court held that an at-large election for a government body with district-based candidate residency requirements did not implicate "one person, one vote" concerns. The City has broad power to establish the procedure and provide conditions for the nomination and election process for city offices. *See e.g. Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008). The procedure established by the Tucson City Charter does not employ a system in which districts of unequal population could result in unequal representation and does not involve unequal weighting of votes. Indeed, "[t]o hold with [Plaintiffs] here and invalidate the election procedure permitted by [the Tucson City Charter], this court would be plowing new ground, and extending the "one man, one vote" principle [] beyond the fields heretofore entered by the Supreme Court. *Holshouser*, 335 F.Supp. at 930-31.

The Court finds the City of Tucson has not placed a severe regulatory burden on Plaintiffs. The Court, therefore, must determine if Tucson's election procedure "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters[.] *Burdick*, 504 U.S. at 434. Plaintiffs argue that, even under the more lenient rational basis standard, Tucson's regulatory interests do not justify the restrictions placed upon the rights of voters. Plaintiffs speculate the regulatory interest is the desire to cultivate accountability mechanisms and incentivize Council members to act for the benefit of the City of Tucson as a whole:

> Specifically, if the ability of a Ward 6 voter to cast a general election ballot for Ward 1's representative is necessary to foster democratic responsiveness and improve the institutional functioning of the Council, there is no apparent rational reason for excluding the same Ward 6 voter from Ward 1's primary election. *See Hosford v. Ray*, 806 F. Supp. 1297, 1307 (S.D. Miss. 1992) (noting the "irrationality" of permitting voters in a city outside the school district to vote for the executive arm of the school board but not the legislative/judicial arm of the district).

Motion, Doc. 3, pp. 12-13. Plaintiffs point out that courts have recognized that overinclusive voting arrangements may traverse equal protection guarantees if such arrangements provide outside voters the numerical strength to decide electoral outcomes. *See, e.g., Burson*, 121

1  F.3d at 250 (holding that franchise was over-inclusive in part because voters of city outside

2  the school district had voting strength sufficient to control seats on the governing body);

3  *Duncan*, 69 F.3d at 97 ("Where the government allocates the franchise in such a manner that

4  residents of a separate area have little or no chance to control their own [representatives],

5  there may be grave constitutional concerns, even where out-of-district voters have a

6  substantial interest."); *Sutton v. Escambia Cnty. Bd. of Educ.*, 809 F.2d 770, 773 (11th Cir.

7  1987) (sustaining overinclusive school district election scheme in part because votes of

8  residents of city served by another district had never been outcome determinative and

9  comprised only a quarter of the total electorate); *Creel v. Freeman*, 531 F.2d 286, 288 (5th

10  Cir. 1976) (upholding overinclusive arrangement in part because the facts "do not show

11  domination by such [outside] residents over county school board elections").

12      However, Defendants assert:

13      Having nominations through primary elections in each ward, using separate ballots
        for each party, allows the party electorates in each of those wards to make their own

14      choice of a nominee, and simultaneously acts as a guarantee for the City electorate as
        a whole that each ward's nominee actually has support among the party members

15      within that ward.  Moreover, since nominees compete in the general election only
        against other candidates nominated in the same ward, see Compl. ¶ 24, ward

16      nominations also help assure that each ward has a local representative on the council,
        and, conversely, that the full Mayor and Council has members who are aware of each

17      ward's issues, problems, and views. According to the Supreme Court, and reading
        "ward" for "borough" and "local" for "rural," the City has a valid interest in ward

18      residency for the council members on its unitary governing body:

19          The principal and adequate reason for providing for the election of one
            councilman from each borough is to assure that there will be members of the

20          City Council with some general knowledge of rural problems to the end that
            this heterogeneous city will be able to give due consideration to questions

21          presented throughout the entire area.

22  Response, Doc. 14, pp. 4-5, (*quoting Dusch*, 387 U.S. at 116).  Defendants also asserts that

23  the procedure gives the ward voters of Tucson a specific voice in its elections.  *Id*. at p. 9.

24      While is not clear what individual ward problems may not cross ward lines, the Court

25  acknowledges that this is an important regulatory interests.  The procedure allows for those

26  with knowledge of each ward's problems and views to intelligently express their views,

27  *Dusch*, 387 U.S. at 116, by having a voice in selecting the candidates for office.  The process

28  established by the Tucson City Charter is not "an evasive scheme to avoid the consequences

of reapportionment or to perpetuate certain persons in office." *Id.* Further, the historical outcome complained of by Plaintiffs, that on at least eight occasions since 1991, a candidate has won election to the Tucson Council in the at-large general election despite failing to carry the ward in which he or she resided and from which he or she had been nominated, would not be altered by allowing all Tucson voters to participate in a ward's primary. The City of Tucson's regulatory interests justify the reasonable, nondiscriminatory restrictions placed by Tucson upon the First and Fourteenth Amendment rights of Tucson voters. *Burdick*, 504 U.S. at 428.

## IV.  *Count II – Dilution of the Right to Vote*

In their Count II, Plaintiffs allege the Hybrid System dilutes them of the right to vote pursuant to the U.S. Const. Amend. XIV § 1 (Equal Protection Clause).[4]  In their Reply, Plaintiffs assert Defendants have conceded the relevant geographical unit is Tucson as a whole.  Therefore, Plaintiffs assert Count I, denial of the right to vote, as opposed to Count II, dilution of the right to vote, is at issue in this case.  The Court, therefore, will dismiss this claim.

## V.  *Count IV – Free and Equal Elections Clause*

Plaintiffs allege the Hybrid System violates the Free and Equal Elections Clause of the Arizona Constitution.  Ariz. Const. Art II, § 21.  The Court of Appeals of Arizona has determined that "Arizona's constitutional right to a "free and equal" election is implicated when votes are not properly counted." *Chavez v. Brewer*, 222 Ariz. 309, 320, 214 P.3d 397, 408 (App. 2009).  While the appellate court discussed other state court decisions that found other viable claims (e.g., claim "in which the voter is [] prevented from casting a ballot by

---

[4]Plaintiffs also assert a violation of the Ariz. Const. Art. II, § 13. Because "[t]he equal protection clauses of the 14th Amendment and the [Arizona] constitution have for all practical purposes the same effect[,]" *Vong*, 235 Ariz. at 123, the Court will not separately address this claim as to the Arizona Constitution.

- 11 -

intimidation or threat of violence, or any other influence that would deter the voter from exercising free will, and in which each vote is [not] given the same weight as every other ballot"), the court did not determine what was all encompassed by the Arizona Constitution.

Moreover, in their response, Defendants asserted this claim was meritless. Plaintiffs did not respond to this assertion in their reply. The Court declines to find that the Free and Equal Elections Clause of the Arizona Constitution affords any greater protections than either the Due Process Clause of the U.S. Constitution or the Privileges and Immunities Clause of the Arizona Constitution. The Court finds, therefore, Plaintiffs are not entitled to relief under this Arizona constitutional provision.

VI. *Conclusion*

Consideration of Plaintiffs' claims of a denial of the right to vote under the Due Process Clause of the U.S. Constitution, the Privileges and Immunities Clause of the Arizona Constitution, and the Free and Equal Elections Clause of the Arizona Constitution is appropriate under a rational basis review. The important regulatory interests of Tucson justify the reasonable, nondiscriminatory restrictions placed by Tucson upon the First and Fourteenth Amendment rights of voters.

Accordingly, IT IS ORDERED:

1.      The Motion for Preliminary Injunction (Doc. 3) is DENIED.

2.      Plaintiffs' claim of a dilution of the right to vote as stated in Count II is DISMISSED.

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

3.      Judgment is awarded in favor of Defendants and against Plaintiffs as to Plaintiffs' claim of a denial of the right to vote under the Due Process Clause of the U.S. Constitution (Count I), the Privileges and Immunities Clause of the Arizona Constitution (Count III), and the Free and Equal Elections Clause of the Arizona Constitution (Count IV).

4.      The Clerk of Court shall enter judgment and close its file in this matter.

DATED this 20th day of May, 2015.


_____
Cindy K. Jorgenson
United States District Judge

- 13 -