1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3   Public Integrity Alliance, Inc.,
    an Arizona nonprofit corporation;
4   et al.,

5          Plaintiffs,
                                   CV-15-00138-TUC-CKJ
6      vs.

7   City of Tucson, et al.,
                                   May 8, 2015
8          Defendants.              9:05 a.m.
    _____   Tucson, Arizona
9
                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
10
             MOTION FOR PRELIMINARY INJUNCTION AND TRIAL
11
           BEFORE:  THE HONORABLE CINDY K. JORGENSON, JUDGE
12
    APPEARANCES
13  For the Plaintiffs:
        Brownstein, Hyatt, Farber, Schreck LLP
14      By:  KORY A. LANGHOFER, ESQ.
             THOMAS J. BASILE, ESQ.
15      One East Washington Street, Suite 2400
        Phoenix, Arizona 85004
16
    For the Defendants:
17      Law Offices of Bosse Rollman & Funk, PC
        By:  RICHARD M. ROLLMAN ESQ.
18      3507 North Campbell Avenue, Suite 111
        Tucson, Arizona 95719
19      Office of the Tucson City Attorney
        By:  DENNIS McLAUGHLIN, ESQ.
20      P.O. Box 27210
        Tucson, Arizona 85726
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

```
 1                P R O C E E D I N G S

 2        (Call to order, 9:05 a.m.)

 3           MR. LANGHOFER:  Good morning, your Honor.  Kory

 4   Langhofer and Tom Basile for the plaintiffs.

 5           THE COURT:  Good morning.

 6           MR. LANGHOFER:  In the gallery we have plaintiff

 7   Bruce Ash and Ken Smalley.  And we also have in attendance,

 8   not a party but an interested party, Eric Spencer who is the

 9   State Elections Director, Secretary of State Michelle Reagan.

10           THE COURT:  And certainly if your clients want to

11   sit up here at counsel table with you they can.  They don't

12   have to, but we have extra chairs if they'd like to come up;

13   or sit on the uncomfortable bench seats, whatever they'd like

14   to do.

15           Good morning.

16           And for the defense.

17           MR. ROLLMAN:  Good morning, your Honor.  Richard

18   Rollman for the defendants.  With me today is my partner,

19   Richard Brown, and Dennis McLaughlin from the City Attorney's

20   Office.  With the Court's indulgence, we would like to split

21   the argument.  Mr. McLaughlin will address the merits of the

22   issues.  I will address the remedy provision.

23           THE COURT:  All right.  Thank you.

24           MR. ROLLMAN:  And, your Honor, in the courtroom

25   today is Roger Randolph.  He's a named defendant.  He is the
```

1    Clerk of the City of Tucson.

2              THE COURT:  All right.  And since he is a named

3    defendant, sir, if you like to come up.  You certainly don't

4    have to.  It's completely up to you, sir.

5              Good morning.

6              All right.  And I do appreciate the briefing on the

7    rather quick time schedule that we have from both sides.  I

8    think there is an understanding, I know both sides talked with

9    my law clerk indicating that today would be the time for

10   hearing on both the preliminary injunction request as well as

11   the permanent injunction.  So basically, today is what we

12   would call a trial even though I don't think any evidence is

13   going to be presented.

14             So am I right on that, that there's really no

15   dispute?  We don't need to have any evidence or testimony

16   presented to the Court about any particular issues?

17             MR. LANGHOFER:  That's correct, your Honor.  We have

18   agreed on everything.  I believe the defendants had one

19   exhibit they wanted to offer, and we stipulate to the

20   admission of that exhibit.

21             THE COURT:  All right.  And I think that was

22   attached to one of the pleadings, so I don't think we have to

23   have it marked separately.

24             MR. LANGHOFER:  That's correct, your Honor.

25             THE COURT:  Okay.

1          MR. ROLLMAN:  Yes, we agree with that.

2          THE COURT:  All right, Mr. Rollman.  So we don't

3    have any factual disputes.  It's obviously interesting and

4    important legal disputes.

5          And I do have some questions, but let me just go

6    ahead and let plaintiff's counsel start.  I don't want you to

7    feel that you have to repeat everything that you've said in

8    your pleadings, but just hit the high points for me.

9          My next hearing is at 11, but we certainly don't

10   have to go until then if you feel like you've adequately

11   covered everything in your briefs.  If there's anything new

12   you want to bring to my attention since the filing, you can

13   certainly do that.

14         So go ahead, counsel.  You can go ahead and get

15   started.

16         MR. LANGHOFER:  Thank you, your Honor.  I do not

17   plan to repeat what is in our briefs.  I do want to touch on a

18   couple of points, though.

19         Before getting to the legal theories, the abstract

20   portion of the argument, I want to start with two very

21   concrete facts.

22         The first fact -- and this is agreed to by the

23   parties, it's not disputed -- the three members of city

24   council who will be elected in 2015 represent all of the city

25   of Tucson.  They represent, among others, plaintiffs Ann

```
 1    Holden and Ken Smalley who are here today.  That's the first
 2    fact.  They will be the representatives of these individuals.
 3                THE COURT:  And that's not disputed.
 4                MR. LANGHOFER:  My understanding is it is not.
 5                THE COURT:  Okay.
 6                MR. LANGHOFER:  The second fact, your Honor, is that
 7    without relief from this Court, plaintiffs Ann Holden and Ken
 8    Smalley and other individuals who don't reside in Wards 1, 2
 9    or 4 will be absolutely denied the right to vote in the
10    primary election for these individuals who are going to
11    ultimately represent them on city council.
12                Those two facts, start with the concrete, those two
13    facts are what we need to analyze the law.  The law says if
14    you reside in the geographic unit that is representing --
15    represented by the elected official, you have a right to
16    participate in the general election and the primary election.
17    That's Gray vs. Sanders, Bullock vs. Carter, Kramer vs. Union,
18    but Gray I think is the most directly on point, the most
19    instructive authority for us.
20                I want to talk about Gray by analogy.  What happened
21    in Gray was the primary election was weighted so that certain
22    counties had more influence than other counties.  That's very
23    similar to what we have in the city of Tucson except that
24    instead of giving lesser weight to outlying wards, the city of
25    Tucson gives no weight to outlying wards.  Only one ward gets
```

1   to choose the primary for every individual -- excuse me, every

2   individual nominee.  If the system in Gray was

3   unconstitutional, how much more so must it be unconstitutional

4   when we completely deny the right to vote to anyone not

5   residing in the ward that's doing the nominating process?

6          THE COURT:  So Gray, how is Gray factually different

7   from our case?

8          MR. LANGHOFER:  Gray is factually different in one

9   way -- essentially different in many ways, but one way that

10  might give rise to a legal argument.  And that is over time,

11  if we took, let's say, a fixed four-year time line instead of

12  a two-year time line in the city of Tucson, all these

13  constitutional arguments come out in the wash.  Because as

14  long as you stay in the same ward and you vote in every

15  election, everyone in the city will have exerted the same

16  fractional amount of influence on the city council.  So that's

17  the one argument that would distinguish Gray.

18          Now, we can come up -- if we tweak the facts in

19  Gray, we could come up to something that would be analogous to

20  this case.  For example, if Gray, instead of being based on

21  counties, said this year everyone in the primary with the last

22  name beginning with the letter A through M or something that's

23  50 percent of the population, you guys get to vote in the

24  primary.  And then next time, N through Z, you get to vote in

25  the primary.  So that over a long enough time line, if

1   everyone stays -- keeps the same last name and keeps voting,

2   everyone has the same amount of influence.  Those facts

3   wouldn't have that -- the factual discrepancy between the

4   hypothetical and the city of Tucson that would permit the sort

5   of argument.

6          Our position, of course, is whenever you cut out a

7   part of the general election electorate based on their name or

8   their ZIP Code or their ward, that gives rise to a violation

9   of the Gray vs. Sanders' principle and the geographic unit

10  being cohesive.

11         Your Honor, I want to speak for a moment, though, on

12  precisely that issue.  Whether over a long enough time line,

13  if everyone ends up having the same amount of influence over

14  the city council elections, we can countenance not full

15  participation in any one election cycle.

16         I thought about this next sentence carefully, and

17  this is not an overstatement I don't believe:  There is not a

18  single American case that adopts the view that constitutional

19  violations can offset each other.  So if we were to look at

20  just this election, we would say to Ms. Holden and

21  Mr. Smalley, yes, you are in fact denied the right to vote for

22  the nomination of your representative, but we're going to make

23  it up to you by making sure in the next election your

24  neighbor's denied the right to vote.  There is not a single

25  case in American jurisprudence that takes a longitudinal view

1    of whether these rights can offset each other.  It just

2    doesn't happen.  What we see from the Supreme Court and on

3    down to the lower courts is we take election cycles one by

4    one.

5            Now, there's a practical reason, of course, that

6    that makes sense.  First of all, if we were to think that the

7    inequality of the election could be evened out over time, we

8    would have to assume, wouldn't we, that people wouldn't move

9    from the wards in which they're living.  Or if they moved to a

10   new ward, they moved to one in the same off-election cycle.

11   We would have to assume that they stick around for an even

12   number of elections.  We have to assume they're indifferent to

13   which primaries they're participating in.

14           Mr. Smalley might say, for example, Look, I know I'm

15   in Ward 2, or Ward 3, what I really want, though, is to

16   influence Ward 1.  That's the election I really care about.

17   That's the representative race that's hotly contested.  It's

18   close.  I have strong feelings about one of the candidates.

19   But if you're not indifferent to which ward you participate

20   in, if you're not sure you're going to be in the city for an

21   even number of election cycles and not move, this assumption

22   doesn't make sense.  Maybe those practical reasons are why we

23   see the cases just do not adopt the longitudinal approach to

24   washing out all inequalities over time.

25           Your Honor, I wanted to spend a little bit of time

1    on the remedies issue.  I understand defense counsel will

2    divide this argument up, and I don't mean to disrupt the flow

3    of their thoughts.

4              THE COURT:  That's fine.

5              MR. LANGHOFER:  We start with the premise, I think,

6    as the City does; that any time a Court is asked to use the

7    federal Constitution to invalidate a local law, especially an

8    important law like an election law, that's a very serious

9    thing.  And we shouldn't do that glibly.  To make sure we're

10   striking the right balance here, the plaintiffs are willing to

11   support any -- a remedy that we could look at and all say that

12   is the narrowest possible remedy.  That would be the slightest

13   intrusion of the judicial branch, the constitutional oversight

14   into local affairs.

15             So what would that look like?  Here's what we think

16   makes sense.

17             First, the Court could find that this scheme does

18   result in a deprivation of the right to vote for people who

19   aren't participating in any given primary election.  Footnote

20   on that, the parties have really briefed this as a Fourteenth

21   Amendment violation.  Count Three is sort of the state law

22   counterpart to the Fourteenth Amendment.

23             THE COURT:  Right.

24             MR. LANGHOFER:  We've agreed that the authorities

25   are the same; the arguments are the same.  If the Court wanted

1   to, it could rule under Count Three rather than Count One.

2   But the arguments are identical, but we would just avoid a

3   federal precedent.

4          THE COURT:  So you agree Count Two is no longer

5   really before the Court?  Still there, but --

6          MR. LANGHOFER:  We agree -- we can dismiss Count Two

7   based on the stipulation that the city councilman represent

8   the entire city.  Count Two only matters if they had taken a

9   position that they represent an individual ward.

10         THE COURT:  And so your concern is that we have this

11  hybrid system.  If we have one system or the other, then you

12  wouldn't be here representing the plaintiffs.  Right?

13         MR. LANGHOFER:  That's correct, your Honor.

14         THE COURT:  You're saying we can't combine the two

15  systems.

16         MR. LANGHOFER:  That's correct.  It needs to be all

17  at large or all ward by ward, but the combination is what

18  doesn't work.

19         Now --

20         THE COURT:  Now, I'm just curious, how do we know

21  that the folks that are elected represent the whole city?

22  That must be written down somewhere.  Maybe that's in the

23  pleadings.

24         MR. LANGHOFER:  So actually, it's an interesting

25  question, your Honor.  The Charter doesn't say that every city

1    council member represents every citizen of the city.  The

2    reasoning is as follows:

3              First of all, the parties agree on this, if it

4    helps.

5              Second, the Arizona Supreme Court, in two cases back

6    when it reviewed another issue in the city council election

7    system, said that every city council member represents the

8    entire city.

9              There's also the analysis in Gray vs. Sanders.  So

10   in Gray it didn't find that the elected representatives

11   represented the county with the greatest weight.  What it

12   found was, look, the entire state represents them in the

13   general election; therefore, their geographic unit is the

14   entire state.  That seems like the right analysis.  If the

15   general election is by the entire city here, we need to

16   conclude that the geographic unit is the entire city.

17             THE COURT:  And I interrupted.  Go ahead with your

18   remedy discussion.  Go ahead.

19             MR. LANGHOFER:  The first step we think would be to

20   declare under the state or federal Constitution it's a

21   violation.

22             The second step would be to settle on a remedy just

23   for 2015.  Not a permanent remedy.  And the Court wouldn't

24   have to inject its own subjective reasoning into that

25   decision.  We could ask the City which one they prefer.

1   Either choice would be constitutional.  If the City can't

2   conclude, our recommendation is certainly ward by ward.  I can

3   make an argument to you about that if you like, but for now

4   I'd like to lay out the summary --

5                THE COURT:  Go ahead.

6                MR. LANGHOFER:  -- of the remedy.

7                The third step, then, would be to come up with a

8   remedy that would last all time, 2017 and beyond.  Again,

9   there would be a way of doing this that avoids injecting the

10  Court's own judgment into that system.  For example, it could

11  give the City the option of referring the issue to the people

12  on the 2015 ballot.  We could let the citizens of Tucson

13  decide.

14               THE COURT:  Has it been on the ballot, this issue?

15  Just curious.

16               MR. LANGHOFER:  Very similar issue has been on the

17  ballot two times.  It's never been said to the citizens, "We

18  are changing the system, which one do you want:  All ward or

19  all at large?"  But they have been asked two times:  Once,

20  "Would you like to go to at large?"; and once later they were

21  asked, "Would you like to go to ward by ward?"  Both times

22  there wasn't a majority of the citizens, but they were never

23  told the current system doesn't work, pick the alternative.

24               So the City of Tucson could refer the issue to the

25  citizens.  They could decide and the Court could, of course,

1  adopt the judgment of the citizens.  If it's not referred to

2  the citizens, the judge would have to decide and make --

3  decide which option is most consistent with the City Charter,

4  the state Constitution, and the ideas of equal protection.

5          Let me say our peace on if your Honor is compelled

6  to decide, if the City doesn't decide for itself.  There are

7  four reasons that I think going ward by ward only instead of

8  having at-large elections make most sense.

9          First is that the City Charter obviously had in mind

10  some sort of tie, ward-based tie from city council to

11  individual wards.  That's the idea of having ward-only

12  elections.  It didn't come out perfectly in the wash, but the

13  idea is in there.

14          In the Arizona Constitution there's additionally the

15  idea if you're elected from a district or some jurisdiction,

16  you have to live within that jurisdiction.  Again, the idea of

17  local ties and elections is in the Arizona Constitution.

18  Although to be fair, I think I should note that the Arizona

19  Constitution has said it doesn't require at large or -- excuse

20  me, the Arizona Supreme Court has said that the Arizona

21  Constitution doesn't compel ward-by-ward elections or at-large

22  elections.  But the idea of local controlled elections is in

23  this phrase in the constitution that requires candidate

24  residency.

25          The third is that ward-by-ward elections are least

1   likely to drown out minority voices.  It could be ethnic or

2   racial voices, political voices, but ward-by-ward elections

3   allow greater control for smaller fractions of the population.

4          The final reason we think ward by ward makes more

5   sense is that the City apparently is concerned that although

6   candidates haven't finished filing their paperwork for the

7   2015 election cycle, shifting at this point to an at-large

8   system would be disruptive.  We candidly disagree with that.

9   But if it is a genuine concern on their part, we can solve

10  that by not shifting for the primary election, keeping that

11  ward by ward, and just making the general election ward by

12  ward as well.  Again, though, I think either ward by ward or

13  at large would be constitutional sufficient.

14         Your Honor, I'm prepared to address any questions or

15  concerns you have about the case, but those are the major

16  points I wanted to speak to.

17         THE COURT:  Now, how do you think the Court

18  should -- strict scrutiny analysis or rational basis?  And

19  that's kind of -- depending on which way the Court goes, is

20  that pretty much dispositive?  I mean, if it's rational basis,

21  do you agree the City has a rational basis for the system that

22  it has in place?  On the other hand, if it's a strict scrutiny

23  analysis, maybe the Court might go the other way.  Or do you

24  think that's not an important distinction?

25         MR. LANGHOFER:  I would be faking it if I said it

 1   wasn't an important decision.  We have an argument for

 2   rational basis, and I'll get to that in a moment, but I'd like

 3   to first explain why we think strict scrutiny is appropriate.

 4          First, the Burdick vs. Takushi test from the

 5   Supreme Court says if there's a severe burden on a voting

 6   right -- severe burden on a voting right, we impose strict

 7   scrutiny.  And if there's a reasonable and nondiscriminatory

 8   burden, by a rational basis.

 9          So there's two cases after Burdick that unpack that

10   for us.  The first is Kramer vs. Union.  Kramer held -- U.S.

11   Supreme Court case -- where there's a deprivation or dilution

12   of the right to vote, per se strict scrutiny.  Squarely on

13   point.  We think that's all you need to look at.  There's also

14   a decision from the Ninth Circuit, Gray vs. City of Tucson.

15   And there they found where there's a deprivation -- I got the

16   holdings backward.  The holding from Gray vs. Tucson was

17   whether there was deprivation or dilution, per se strict

18   scrutiny.  Kramer said whenever you have a geographic unit and

19   you exclude some people from that unit, you exclude them from

20   the franchise, you apply strict scrutiny there.  Both Kramer

21   and City of Tucson unpack the Burdick test for us and show

22   strict scrutiny is what's required here.

23          Our fallback position is this:  If rational basis

24   applies and if we're agreeing that every city council member

25   represents the entire city, it is not rational to limit the

1   franchise to people within a certain geographic unit when

2   we've already agreed they represent the entire city.  The best

3   case on that point is Hosford vs. Ray cited in the briefs.

4   And I think that is the strongest argument we would have if

5   the Court applies rational basis scrutiny.

6           THE COURT:  What about is it Dusch?  Is that how you

7   pronounce it, D-u-s-c-h?

8           MR. LANGHOFER:  Yes, your Honor.

9           THE COURT:  What do you think about the Dusch case?

10  I mean, that was an earlier case.  Do you think that was using

11  a strict scrutiny analysis or not?

12          MR. LANGHOFER:  No, it did not use strict scrutiny.

13  The Dusch case fits in a different line of cases about

14  candidate residency requirements.  And Dusch says expressly,

15  look, if the residency was tied to voting privileges and not

16  just candidacy, our analysis wouldn't be the same.  It

17  wouldn't follow.  And Dusch says expressly, even though you

18  have candidates or candidates living in certain parts of the

19  geographic unit, in the end we all know they represent the

20  entire geographic unit.  So it wasn't concerned about making

21  candidates living in one place or the other.

22          The footnote two in our reply brief addresses this

23  issue, too.  Whenever you've got limitations on what the

24  candidate has to look like, it's a much less rigorous standard

25  of review.  There are durational residency requirements, for

1   example, for candidates that have been upheld by federal

2   courts.  You can't do that with voters.  If you're a resident

3   in the district, even if you moved there recently, as long as

4   you established a domicile there you can vote.  Candidate

5   residency requirements, they're not strict scrutiny.

6          THE COURT:  Now, what about the City of Tucson cites

7   to some other communities that use the same model.  I'm

8   assuming that if there were cases where those models had been

9   challenged, they've never been challenged as far as you know.

10         MR. LANGHOFER:  No.  We put a lot of time trying to

11  find a precedence squarely on point.

12         THE COURT:  The Court loves those kinds of

13  precedence.

14         MR. LANGHOFER:  The plaintiff does, too.

15         THE COURT:  Especially from the Ninth Circuit.

16         MR. LANGHOFER:  We cited to you what we think are

17  the best authorities.

18         There have been other -- I think there were two

19  other cases we found where a similar system, where you have

20  ward-based, sub-unit based primary and at-large generals were

21  invalidated, but they were not invalidated on federal

22  Constitutional grounds or even state equal protection grounds.

23  One of them was the California voting rights act.  So there's

24  certainly election-law-type regulations, but we don't think

25  they're on point enough here to cite claims and authority.

1          THE COURT:  What was the first, if you know,

2    Supreme Court case that used the strict scrutiny/rational

3    basis analysis in voting election cases?

4          MR. LANGHOFER:  May I have a moment?

5          THE COURT:  Was it after that Dusch case?  If you

6    don't know, that's fine.  I'm just trying to see when the

7    Court started using that particular analysis.

8          MR. LANGHOFER:  Sorry for the caucusing, your Honor.

9          THE COURT:  No, that's okay.

10         MR. LANGHOFER:  And gratitude to opposing counsel

11   for helping us through it, too.

12         THE COURT:  Okay.

13         MR. LANGHOFER:  Between Gray and Kramer, so that's

14   1963 to 1969, the Supreme Court settled on this framework.

15   The earlier cases certainly had hints of it.  I think U.S. --

16   strike that.  Smith v. Alright has hints of it.  But somewhere

17   between Gray and Kramer, I think it's fair to say the Court

18   settled its doctrine.

19         THE COURT:  Thank you.

20         MR. LANGHOFER:  Thank you, your Honor.

21         THE COURT:  And let's see, Mr. McLaughlin, first.

22   Good morning.

23         MR. McLAUGHLIN:  Good morning, your Honor.  Dennis

24   McLaughlin for the City Attorney, and I'm going to do the

25   merits.  And we appreciate your letting us split the argument.

1            THE COURT:  Sure.

2            MR. McLAUGHLIN:  Your Honor, to answer a couple of

3    your questions or try to, and I'll let you renew them if I

4    don't, you had asked about the City's unitary government.  And

5    Charter Chapter 3, Section 1, this is at page 3 of our

6    opposition, provides for a unitary mayor and council, but each

7    member residing, and I'll read you what the provision says.

8    It says, "The government of said city shall be vested in a

9    mayor and council of six members, one from each ward.  They

10   shall be nominated, elected, and have such powers and duties

11   as are provided by this Charter."

12            Then in Chapter 16, Section 9, council members are

13   nominated by ward and elected at large.  And it says,

14   "Beginning in the year 1930 and continuing thereafter, the

15   mayor shall be nominated from and elected by the voters of the

16   city at large and the councilmen nominated each from and by

17   the respective voters of the ward in which he resides and

18   shall be elected by the voters of the city at large."

19            Now, no one disputes that because they're ultimately

20   selected at large, that Tucson council members, although

21   nominated by ward, represent the entire city.  And Arizona

22   Supreme Court has said that, too.  They said that in City v.

23   State which is from 2012.  We cited that also.

24            THE COURT:  So you would agree that Count Two is

25   really not a viable count?

1          MR. McLAUGHLIN:  Yes, we think Count Two --

2          THE COURT:  Count One is what the Court needs -- and

3    Three --

4          MR. McLAUGHLIN:  Count One, Three, Four are the only

5    ones.  We don't think Count Two is really there anymore.

6          If I can just add, the Supreme Court in terms of

7    this unitary government, in Fortson v. Dorsey which is cited

8    in our opposition, and I'm paraphrasing because I have some

9    brackets in here, but I'll say it in city terms:  Each ward's

10   council member must be a resident of that ward.  But since his

11   tenure depends upon the citywide electorate, he must be

12   vigilant to serve the interests of all the people in the city

13   and not merely those of the people in his ward.  Thus, in

14   fact, he is the city's and not merely the ward's, and I left

15   in senator by mistake, should have said council member.  And

16   that's Fortson v. Dorsey.

17         THE COURT:  Does it matter to me why the City chose

18   this system?

19         MR. McLAUGHLIN:  No, your Honor.  We think it's

20   rational basis test, and we think there is a rational basis.

21   And it wouldn't even have to be the one that we thought up.

22   You could think up whatever you want to think.  If there's any

23   basis, we win.

24         One correction, and I have no sense that this was an

25   intentional mistake, I just want to clarify.  It may not have

1    even been a mistake, but opposing counsel talked about who

2    votes for whom.  You do vote for the council member nomination

3    in your ward so there is a vote that you do depending on where

4    you reside every other election.  And that's just one minor

5    clarification to what he said about you don't vote for other

6    council members.

7           Your Honor, he cited Gray v. Sanders.  And our

8    position, and I'll go through this in a little more detail,

9    but Gray v. Sanders, the problem in Gray v. Sanders was it was

10   a general election.  I believe it was either statewide or

11   districtwide.  And the problem in Gray was certain counties

12   and certain voters got more weight to their vote.  The way

13   Georgia set up their -- they had the county unit system.  And

14   the problem in Gray was that not everybody within the district

15   was getting equal weight of vote.  And it was a general

16   election.  I don't believe it was a primary election.  I may

17   be wrong on that.  I will go -- the case says what it says.

18   But that was the problem in Gray.

19           And that brings me to my -- I'm going to do a

20   nutshell review for you of equal protection voting rights

21   jurisprudence.  I promise not to belabor this, and do

22   interrupt me with questions.

23           There are basically three situations that can arise

24   under equal protection voting rights.

25           The first one is you have a district so you've got a

box, and there are voters within that box.  They all reside in
the box.  Their votes either aren't counted equally or certain
voters are allowed to vote and certain others aren't.  That's
strict scrutiny and we don't dispute that.

In the City's case, all the voters in our general
election citywide vote in the general election.  And in our
primaries that are held by ward, all the voters in the ward
vote by ward.  Two separate elections.  We don't discriminate.
We don't weight the votes differently.  We say we can have two
separate elections under equal protection voting rights
jurisprudence.

THE COURT:  And all the wards are treated the same?

MR. McLAUGHLIN:  All the wards are treated the same,
all the wards have equal population.  Substantially equal.
They acknowledged that in their pleadings.

THE COURT:  Do you think that matters?  Well, I
don't need to know that, but I'm just curious.

MR. McLAUGHLIN:  I think that it's good thing to
have, let's put it that way.  Because I think if there were
unequal ward populations there could be other issues to this.
But in one sense I don't think it does matter, in the sense of
they are separate elections.  But I'm just glad we don't have
that as a distraction.

THE COURT:  You don't need to explain that to me.

MR. McLAUGHLIN:  Right.  So let me give you a few

1   examples of the residents in the box unequally treated.  Gray

2   v. Sanders, their votes were unequally weighted depending on

3   where they lived in the voting district, which I think was

4   statewide in that case, and certain counties were favored over

5   others and certain voters in those counties were favored over

6   others.  Strict scrutiny.

7          Kramer.  Kramer, residents in the school district

8   who were property owners, owners or lessees of taxable realty

9   or their spouses, or parents or guardians of children could

10  vote.  Other residents of the district couldn't vote.  They

11  all reside in the district, but they can't -- certain of them

12  can't vote.  Strict scrutiny.

13         Carrington vs. Rash, Texas says if you're a military

14  service member, you can never become a resident of Texas for

15  purposes of voting.  They were obviously trying to keep black

16  service members from voting in the state elections.  So

17  whatever district you were in, even though you resided, you

18  couldn't vote when other people could.

19         Last one and then I'll shut up on this.  Evans v.

20  Cornman, residents of a Maryland federal enclave were by

21  definition stated not to be Maryland residents for voting

22  purposes.  They resided in Maryland, but they were told:  You

23  can't vote in Maryland because you're on a federal enclave.

24  Again, discrimination between voters within the box.  Standard

25  and strict scrutiny.

1          Here's the second situation.  Residents within the

2     box, they're not told they can't vote or that their votes are

3     going to be weighted differently, but there's some burden

4     placed on their vote or so they allege.  That's Burdick v.

5     Takushi.  That's what's called the immediate standard or the

6     balancing standard.  Would you like me to read that standard

7     or --

8               THE COURT:  Sure.  Go ahead.

9               MR. McLAUGHLIN:  A Court considering a state

10    election law challenge must weigh the character and magnitude

11    of the asserted injury to the First and Fourteenth Amendment

12    rights that the plaintiff seeks to vindicate against the

13    precise interests put forward by the state as justification

14    for the burden imposed by its rule, taking into consideration

15    the extent to which those interests make it necessary to

16    burden the plaintiffs's rights.

17         And I'll inject here.  They were saying this in the

18    context of not every burden on voting involved strict

19    scrutiny.

20         Under this standard, a regulation must be narrowly

21    drawn to advance a state interest of compelling importance

22    only when it subjects to the voters' rights to severe

23    restrictions.  If it imposes only reasonable,

24    nondiscriminatory restrictions upon those rights, the

25    state's important regulatory interests are generally

1   sufficient to justify the restrictions.  And in <u>Burdick</u>

2   itself, I believe it was a Hawaii voter who said, "I can't do

3   write-in voting.  You don't let me do write-in voting."  And

4   they said not unconstitutional for them to bar write-in voting

5   because they make it very easy to get on the ballot.

6          And <u>Burdick</u> is also interesting because it's clear

7   from that that when you were dealing -- this was involving

8   both primary and general elections.  They said essentially the

9   interests of the state can involve not simply the interest of

10  the party, which is who the primary is theoretically for, but

11  it can also be for the benefit of the public.  And that's

12  going to be important for our rational basis because we want

13  to benefit the public in having ward nominations.

14         But I'm not saying <u>Burdick</u> applies.  I'm saying

15  <u>Burdick</u> talks about what can be a rational basis because

16  neither <u>Burdick</u> nor the <u>Kramer/Carrington</u> line are applicable

17  here.  We do not have residents within the electoral box in

18  either of these -- in the -- certainly in the ward election.

19  In the citywide general election, everybody votes.  Well, if

20  everybody votes, there's no basis, very respectfully, for

21  your Honor to be interfering in that election.  So why are we

22  talking about going to all districts?  We certainly would

23  oppose that.  If there's anything that's going to happen, and

24  we don't think anything ought to happen, the only possibility

25  should be, well, citywide general, citywide primary.  Not ward

```
 1    by ward on both because there's no basis for you to interfere
 2    in the citywide general.  Everybody is voting.  But these are
 3    two separate elections.
 4              THE COURT:  Well, that's what I wanted to ask you.
 5    It's not one -- these are -- it's not one big election with
 6    two parts.
 7              MR. McLAUGHLIN:  Exactly.
 8              THE COURT:  It's two separate elections.
 9              MR. McLAUGHLIN:  Right.  In fact, it's very much
10    separate factually because by its nature the primary is a
11    completely different election.  It has a different electorate.
12    It's all party members.  And constitutionally, we couldn't
13    form some hypothetical equivalent to a general election
14    because we can't combine all the parties into one election.
15    It's essentially every party having its own small election for
16    the primary.
17              So it's different electorates.  Different people are
18    on the ballot.  The only people that are on it are possible
19    party nominees, not anyone else.  And it's held at a different
20    time.  It's about ten weeks apart.
21              THE COURT:  So the geographical unit for the primary
22    and general elections don't have to be the same?
23              MR. McLAUGHLIN:  That's definitely our position.
24              THE COURT:  Okay.
25              MR. McLAUGHLIN:  And --
```

```
 1            THE COURT:  What case do you think --

 2            MR. McLAUGHLIN:  There's --

 3            THE COURT:  -- most ably supports that?

 4            MR. McLAUGHLIN:  There's a series of cases that we

 5  cited in our opposition.

 6            THE COURT:  Okay.  You can just tell me what page.

 7            MR. McLAUGHLIN:  Yeah, pages -- it's basically

 8  pages -- really, it starts on page 5, but the key ones you

 9  want are page 6.

10            THE COURT:  All right.

11            MR. McLAUGHLIN:  Line 5.

12            THE COURT:  Yes.

13            MR. McLAUGHLIN:  All the way to 6, line 25.  And

14  then on 7, 1 through 6, I tell you why our Charter is the

15  equivalent of a state action to give us this power.

16            If I can, your Honor, if you'll just indulge me --

17            THE COURT:  Take your time.

18            MR. McLAUGHLIN:  -- two other cases that I want to

19  say in addition.  All of those cases say that.  And in terms

20  of the primary, I also would point you to the O'Toole case

21  which is page 11.  The key point is lines 14 through 17.

22            THE COURT:  Yes.

23            MR. McLAUGHLIN:  Where we talk about it provides the

24  conditions under which the endorsement is to be received; in

25  other words, the conditions under which the primary will
```

1    occur.  And I note, we don't dispute that the primary is an

2    election.  I said that on page 11.  But it's a separate

3    election.  And under the state's power to create districts for

4    elections, it's a plenary power.  It can be a different

5    district.

6              And I'm going to get to the direct precedent in the

7    Stokes case in a moment here, but did I answer your question?

8              THE COURT:  Yes, thank you.

9              MR. McLAUGHLIN:  Great.

10             Opposing counsel mentioned election cycles one by

11   one.  That phrase struck me.  And I really think it's

12   elections one by one.  He wants to make the -- it one big

13   election.  We say it's the elections need to be treated one by

14   one for purposes of the rational basis.

15             So what are we?  We're not strict scrutiny.  We're

16   not the Burdick.  We're situation three.  We've created an

17   electoral jurisdiction, in this case the primary wards.  We

18   have persons who aren't resident in the jurisdictions saying,

19   You have to give us the right to vote in that election.  We

20   don't reside in it, but we want a right to vote in it.  That's

21   Holt/Herriman.  That's the rational basis analytically.  The

22   Supreme Court has said that this one-person-one-vote or the

23   strict scrutiny is never applied outside the boundaries of the

24   electoral district that the state has created.  And the state

25   gets to create what that electoral district is if it has a

1  rational basis.  And we do have a rational basis.

2          Now, this is a natural outgrowth of the City's

3  power, and I cited you the cases.  The qualification of its

4  own voters for municipal offices and the nature of its

5  machinery for the filling them, Oregon v. Mitchell; the manner

6  in which officers are chosen, the Boyd case; when voting will

7  be allowed and under what terms, Lassiter, McPherson, Pope,

8  Carrington, Dunn; whether primaries occur at all, American

9  Party of Texas; and the conditions under which they occur,

10  O'Toole.  So one way you can decide this case is analytically

11  under Holt and under these cases.

12          Now, there's another way can you decide it and that

13  is direct precedent.  And the two cases I'm assuming you were

14  able to -- and I do apologize that I didn't get these into our

15  opposition, but I filed a notice of supplemental authority

16  about the Stokes case and the Holshouser case.

17          THE COURT:  Yes.

18          MR. McLAUGHLIN:  Those are both cases from -- one is

19  from '64 and one is from '71.  They involve judges being

20  nominated from respective circuits but elected statewide.  And

21  in Stokes they did exactly the analysis that you can follow

22  and also serves as direct precedent.

23          Plaintiffs alleged a Fourteenth Amendment equal

24  protection violation.  The court was unable to discern any

25  discrimination among voters or unequal weighting of votes of

 1   the sort condemned by one-person-one-vote.  So nothing to stay

 2   strict scrutiny.  It analyzed the election separately.  It

 3   found no discrimination in either the nomination or the

 4   election process considered separately.  And the votes were

 5   equal in both elections.  The votes of each person in the

 6   statewide election were equal.  Statewide electors could vote

 7   for the nominees from each circuit.  Exactly what happens in

 8   our general elections.  And then the vote of each person in

 9   the judicial circuit was equal to the nominating process in

10   the nominating process.

11          And the fact that the statewide could override the

12   choice of the circuit, here they are citing that this can

13   happen in the city elections, in no way offended

14   one-person-one-vote.  Rational basis was applied; a rational

15   basis was found.  The system accords a voice to both the

16   residents of the circuit and the entire state.  In other

17   words, it affords proper recognition to the interests of all.

18   Exactly what we're saying.  There was no violation of the

19   Fourteenth Amendment.

20          Holshouser v. Scott, I won't beat the dead horse,

21   summarily affirmed by the Supreme Court which I'll get to a

22   moment.  Same analysis.  And they actually may have gone off

23   more on one-person-one-vote doesn't apply to the judiciary,

24   but they quote the Stokes analysis and they do apply a

25   rational basis test.  And again, they find there's both local

 1   and statewide interests that are being addressed here.

 2          Now, these cases long predate -- well, not long,

 3   Holt and Herriman, they predate Holt which is '78.  But they

 4   dovetail perfectly with this idea of a geographical limit that

 5   applies to different elections and that the state is free to

 6   impose.  And that should apply to this situation and provide

 7   direct precedent.

 8          THE COURT:  What about this Dusch or Dusch?

 9          MR. McLAUGHLIN:  Dusch says -- that was a case where

10   they had -- everybody was elected at large, but there was a

11   residency requirement.  And there's one quote in there that

12   the opposing side uses that says, Well, it would be different

13   if this was used somehow for voting.

14          But the concern on the voting there, the City says,

15   was if you had a general election like the one in Gray, where

16   you have districts of unequal population that are all voting

17   for one member so you have unequal distribution of the weight

18   of the votes, like a Gray v. Sanders' situation, or there's

19   discrimination somehow that people aren't being allowed to

20   vote who should be being allowed to vote -- in no sense were

21   they saying you couldn't have a nomination that would feed

22   into a general that was perfectly -- where both were perfectly

23   legal.

24          We don't think that the concern in that case -- you

25   already had an at-large and residency in the wards, which is

```
1    what we have.  And we don't reduce -- or the Dallas County, I
2    believe it was, case, it was a companion case to it, we don't
3    read either of those as saying you can never have nominations
4    by some other unit.  They were saying we don't -- we don't
5    like the idea that you would have a general, but there would
6    be like county unit voting where there would be unequal voting
7    or discrimination in the general election, because it's always
8    the election.  It's election by election.
9              Herriman, I cited to you in the opposition.  And I
10   cited to you certain things that were said in that case that
11   were very useful here.  How much leeway the states have in
12   discriminating in different governmental units or electoral
13   districts even when the outcome will affect the voters.  And
14   you recall in Holt the people were subject to Tuskaloosa
15   policing, a lot of police authority.  And the Supreme Court
16   said it doesn't matter that may affect you.  You're not within
17   the -- within the voting district.  You don't get to vote.
18             And Herriman said the same thing about the school
19   district voters, that only certain school district voters were
20   voting.  We think the same applies to the idea of the primary.
21   That the claim is, well, these people will eventually be
22   elected and that may affect us.  Well, the City is still able
23   to say for the nomination, in order to have a rational
24   contribution from the localities, we're going to have a
25   different nomination process and that's not unconstitutional.
```

1           The State has a right to draw different boundaries

2    for voting purposes, and we generally defer to these

3    delineations as the Tenth Circuit as long as the separate

4    units further reasonable government objectives.  And here they

5    do.

6           And finally, the Supreme Court has consistently

7    upheld laws that give different constituencies different

8    voices and elections.  All of those apply here.

9           THE COURT:  So do I need to hear about the

10   reasonable government interest in setting up this particular

11   type of election or not?

12          MR. McLAUGHLIN:  I will be glad to tell you what we

13   are -- our position on those interests.

14          THE COURT:  Okay.  And I'm sure that's covered in

15   your --

16          MR. McLAUGHLIN:  Page 4, line 16 of our opposition,

17   leading up to --

18          THE COURT:  So it promotes --

19          MR. McLAUGHLIN:  -- 5, line 7.

20          THE COURT:  Promotes the individual ward, it helps

21   each ward to have better representation --

22          MR. McLAUGHLIN:  Yes.

23          THE COURT:  -- by ward?  Is that the idea?

24          MR. McLAUGHLIN:  Each party's ward -- each party's

25   ward voters get to make their own choice of a nominee, and

1  that acts as a guarantee for the electorate also; that the

2  nominee actually has support among the party members in the

3  ward.  And then the nominees compete in the general election

4  only against other candidates from the ward.  So it guarantees

5  each ward has a local representative and, conversely, that the

6  full mayor and council have members who are aware of each

7  ward's problems and issues.

8            THE COURT:  All right.  Thank you.

9            MR. McLAUGHLIN:  So let me just conclude the

10  discussion before I go to my final point.

11            There's nothing whatsoever in the voter

12  protection -- excuse me, equal protection voter rights

13  jurisprudence that says what plaintiffs want to claim here.

14  And you can say it about three different ways and they're all

15  invalid.

16            One is you have to let me vote in the primary if you

17  let me vote in the general.  Not true.  If you get to vote in

18  one election, you automatically get to vote in another

19  election.  Not true.  You analyze it on the basis of state

20  power election by election.  If the state creates a particular

21  electoral district for the general election, the state has to

22  use the exact, same district for its primary election.  Not

23  true.  Fortson and Stokes -- excuse me, Stokes and Holshouser.

24            And I would note those are not one-person-one-vote

25  cases strictly speaking because they weren't dealing with the

1   discrimination within the box.  What they both were basically

2   saying is if you have a statewide general, you have to have a

3   statewide primary which is a little bit different.  And I say

4   that for a reason.  A couple of reasons.

5           I want to just to look at New York State Board of

6   Elections Lopez Torres and other of the cases that I cited in

7   the supplemental authorities.

8           First, look at the facts of that case.  Party voters

9   in the legislative districts elect delegates.  There's a

10  convention.  And they nominate people who are elected in a

11  larger judicial district that comprises -- each judicial

12  district comprises certain legislative district.  And then all

13  voters vote in the judicial district.  So, in other words,

14  they differ in size, they differ in jurisdictions for

15  nomination and election.  And in Lopez Torres there's even

16  intervening convention that makes it more convoluted.  The

17  Supreme Court doesn't bat an eye.

18          If this claim that because we have a general of one

19  district we have to have a primary of the same district is

20  true, why didn't they bring that up in Lopez Torres?  That's

21  an obvious claim.  They wanted a direct primary so why not

22  claim that they get a direct primary in the same district?

23  They never raise it.  The case specifically says nothing to

24  indicate that there needed to be a primary in the same size or

25  delineation of district as used for the general.

1            Now, they also made -- taking it from the reverse

2    angle, they made a specific legal point because the Republican

3    party had the right to appear on the general election ballot

4    through the state process -- and that's why we have Exhibit 1

5    for you because the same thing is true here in this case.

6    They are a qualified party and their nominees will go on their

7    general election ballot, and Exhibit 1 has the clerk saying

8    that.

9            The state acquires legitimate governmental interests

10   in assuring the fairness of the process, and that enables the

11   state to proscribe what the process will be.  So the Ninth

12   Circuit adopts that concept in Alaskan Independence Party,

13   which is another of the supplemental authorities.  And in

14   fact, they say that reasoning would survive any level of

15   scrutiny including strict scrutiny.  Now, I hasten to say we

16   don't -- we know Lopez Torres was a First Amendment right of

17   association case.  I'm not saying it's direct precedent or it

18   should be applied here, but it has these interesting points

19   for your consideration.

20           Because the same principles apply under the Charter

21   and the statutes, as I said, under Exhibit 1.  They're

22   eligible for our ballot based on the primary, so we get a say

23   in how that primary is structured to the point where I don't

24   think even under strict scrutiny they could argue it.

25           So why do I tell you all this?  Well, they weren't

1   going to win under a First Amendment right of association

2   case.  That's why you're seeing this as an equal protection

3   case.  Our position is this is Lopez Torres.  They want more

4   influence.  They want a different way that this process works.

5   And they want to do it through an equal protection claim

6   because they won't win it on a First Amendment claim.

7         And that leads me to the final broad or legal point

8   that it makes, that I want to make you aware of.  Which is

9   when you read the Scalia opinion, he makes it clear that the

10  federal courts are not going to get involved in these

11  arguments over what is fair, what is just, what's the best

12  system, what's going to give you, the individual voter or

13  candidate, more influence.  The federal courts decide

14  constitutional issues and these are not constitutional issues.

15  There's no equal protection claim in how we structure our

16  primary and general election assuming we have a rational basis

17  for the distinction that we're making.  Certainly none that

18  they are bringing here.  And that should apply in this case

19  under equal protection.

20        I would circle back to what was said in Luther v.

21  Borden in the conclusion of our brief.  It's not the federal

22  court's job to say who's going to vote, to say who has a right

23  to vote, who didn't, granting rights to vote that didn't exist

24  under state law or restraining them when they do.  Federal

25  courts don't get involved with that.

 1           So I think there are actually three ways to rule for
 2    the City.  I told you two of them.  One is the Holt
 3    analytical.  Holt/Herriman.  Second is Stokes/Holshouser,
 4    direct precedent.  And the third related to the second, I
 5    believe, with the greatest respect to your Honor, that because
 6    Holshouser was summarily affirmed and because of the issues it
 7    raises, the summary affirmance binds you.  And my two cases
 8    that I would ask you that read to see if you agree or disagree
 9    with me are Mandel vs. Bradley, 1977 Supreme Court,
10    432 U.S. 173 and it's at 176.  And a case they referred to in
11    that case is Hicks v. Miranda, 422 U.S. 332, and that's a 1975
12    case.  So let me read you just briefly what they say in Hicks
13    v. Miranda and then I'll turn it over to Mr. Rollman.
14           And obviously I'm -- there's only certain portions
15    I'm telling you, but please read the whole thing.  Hicks v.
16    Miranda held that lower courts are bound by summary actions on
17    the merits by this court.  But we noted that ascertaining the
18    reach and content of summary actions may itself present issues
19    of real substance.  Later they say:  When we summarily affirm
20    without opinion, we affirm the judgment but not necessarily
21    the reasoning by which it was reached, which is, I think,
22    significant particularly for Holshouser if you get into the
23    one-person-one-vote for judicial office, which is maybe one
24    the reasons that they decided the case.
25           But here's the key thing -- it actually works for us

1    here:  Summary affirmances and dismissals for want of a

2    substantial federal question without doubt reject the specific

3    challenges presented in the statement of jurisdiction and do

4    leave undisturbed the judgment appealed from.  They do prevent

5    lower courts from coming to opposite conclusions on the

6    precise issues presented and necessarily decided by those

7    actions.

8              Now, in Holshouser and Fortson, they raise the

9    precise issue that plaintiffs are bringing here, which was if

10   you have a statewide general election, if your general is

11   districtwide, statewide in that case, then the primary has to

12   be the same.  It's either got to be all districts or all

13   statewide.  And in both of those cases, that specific issue

14   was specifically rejected as an equal protection claim.  And I

15   think under Mandel and Hicks, that's a third string to the bow

16   in terms of affirming or finding for the defendants in this

17   case.

18             If you don't have any other questions, I'm sorry if

19   that took a long time.

20             THE COURT:  No, I appreciate the argument.

21             MR. McLAUGHLIN:  I'll be glad to answer any

22   questions or turn it over to Mr. Rollman.

23             THE COURT:  No, thank you.  That's fine.

24             So Mr. Rollman, come on up.

25             MR. ROLLMAN:  Thank you, your Honor.

1          My portion of the discussion does not involve the

2     difficult and sophisticated constitutional questions.  It's on

3     much more of a practical level.

4          The standards for issuance of an injunction actually

5     are set for by the Ninth Circuit in a case that plaintiffs

6     cited.  It's the American Trucking case.  And in the

7     discussion portion, first paragraph of the discussion portion

8     of that opinion, the Court notes that there are four

9     standards.

10          Likelihood to succeed on the merits.  That's a

11     well-understood standard, but it's not enough by itself.

12          Irreparable injuries is the second standard, but

13     that also is not enough by itself.

14          The third and the fourth requirements for an

15     injunction are what are of interest to me this morning, and

16     that is that the balance of equities tips in favor of the

17     plaintiff; and that an injunction is in the public interest.

18          So how does the -- how do the equities and the

19     public interest play out in this case?  Well, to begin with,

20     if one assumes that the present system is unconstitutional --

21     and I didn't come up here to argue that part.  You already

22     heard from Mr. McLaughlin on that point.  But if one assumes

23     that the system is unconstitutional, then as a practical

24     matter, the Court cannot really direct the City itself to

25     change it.  The Court is going to ultimately have to make that

1   decision and pick one of these solutions or give the City an

2   opportunity to allow the voters to change it.

3          Here's the reason:  Mayor and council by themselves

4   cannot change the manner in which primaries are conducted.

5   That power is reserved by the Charter to the people.  The

6   people have put into the Charter the manner in which the

7   primaries are to be conducted.  Now, the Court can tell mayor

8   and council that they need to refer to the people at the next

9   general election a solution to this problem.  That's possible.

10  But that would delay a remedy this year.  The remedy would be:

11  Mayor and council, you're instructed to submit to the people a

12  referendum.

13         THE COURT:  And they have to pick one or the other.

14         MR. ROLLMAN:  They could pick one or the other.  As

15  a practical matter, the way you have to write a referendum, it

16  would be a "yes" or a "no."  And you have to indicate the

17  effect of a "no" vote and the effect of a "yes" vote.  So it

18  would be tough to give an either/or.

19         But here's how I think it would be work in real

20  life:  I suspect what would happen is mayor and council would

21  indeed select one method.  They would then refer it at the

22  next general election.  The way these things go is there would

23  be a publicity pamphlet prepared.  The publicity pamphlet

24  would include arguments pro and arguments con to that

25  particular solution.  And then there would be sufficient time

1    allowed so that if interested parties in the electorate

2    desired, they also could, by initiative, put another solution

3    on the ballot.  If there are competing solutions on the

4    ballot, the solution that has the highest percentage "yes"

5    vote would be the solution that would be adopted.

6          That would allow for the full public participation.

7    It would allow for the full participation of the electorate.

8    And it would implement the Charter process in the structure of

9    the government.  It would allow the government to govern.  To

10   have this Court interfere with that process would influence

11   the result of the process.

12         You heard the argument that was presented to you

13   today for ward-by-ward elections rather than an at-large

14   election.  It was a political argument.  It spoke in terms of

15   the benefit to one party as opposed to another party of a

16   particular political structure, and it gave a number of

17   reasons, and for many people those reasons will be very

18   appealing.

19         For other people, I suggest, there are

20   countervailing reasons.  There are different political

21   interests that are involved.  There is an importance to having

22   an at-large election of council members.

23         So the Court would have to take -- have to take a

24   position on a political question, and the position it takes

25   would be adopted by the side that favors that position, and

1   the Court would be used to influence the outcome of the

2   election:  This is what the Court has indicated is the most

3   appropriate way; this is the solution that the Court has

4   adopted.

5           That's not a position that the Court should want to

6   be in.  The Court should not be influencing the outcome of a

7   political process.

8           Now practically, there's not time to conduct an

9   election to change the Charter before the primary.  It

10  probably doesn't even require explanation.  There's not an

11  election before the primary.  There's not time to schedule an

12  election before the primary.  There's not time to allow the

13  debate that would be needed to allow public discussion, to

14  allow the electorate to decide if individuals want to submit

15  their own initiative, to gather signatures for an initiative.

16  There wouldn't be time to really gather the pro and con

17  arguments to be inserted into the publicity pamphlet.  It

18  can't be done.

19          So as a practical matter, the question -- if the

20  Court determines that the current system is unconstitutional,

21  the practical solution is to direct that a change be placed on

22  the ballot in the next general election.  Is this something

23  that the Court has the authority to do?  Absolutely.

24          Now, in one of the cases that we cited, it's the

25  Charleston County case, United States v. Charleston County,

1    the district judge there found that the current system of

2    at-large elections was violative of the Voting Rights Act, and

3    so the court then had to consider whether or not to grant an

4    injunctive relief.  And in evaluating that, the court relied

5    heavily on the earlier Fifth Circuit decision in Chisom v.

6    Roemer which we've also cited in our papers.  And they noted

7    what I think is well-settled law, that intervention by the

8    federal courts in state elections is serious business.  It's

9    not to be engaged in lightly.

10           And although the Court can use its power to correct

11   a constitutional error, it needs to maintain a proper balance

12   with the power given to local governments to allow local

13   governments to govern.  The conduct of elections is so

14   essential to the self-determination and self-government of

15   local elections that there's a strong public interest in

16   having elections go forward even if there is a defect in that

17   current election process.  We suggest that that principle

18   applies here.  And I suggest that principle applies here

19   because a decision that you make will effectively, if you

20   adopt the ward by ward, disenfranchise significant number of

21   voters in the city at the general election from participating

22   in the election of council members.

23           There's six wards.  Presently all city voters get to

24   participate in that election.  Should you enter an order

25   saying that only residents of that ward can vote in that

1   election, you will have disenfranchised five-sixth of the

2   city.  Disenfranchising five-sixth of the voters is an

3   extraordinary action.

4          If, on the other hand, you enter an order that says

5   the primary must no longer conform with the Charter

6   provisions, but instead the primary must be a general

7   election, you may well alter the outcome of an election.  You

8   may well alter the outcome of people who wanted to participate

9   in the election.  You may well alter the results of that

10  election because no longer will it be a decision made by the

11  citizens and the voters of a particular ward, but a much

12  larger group normally reserved only for the general election.

13         Either way you decide it, you are changing and

14  altering the manner in which an election is conducted and,

15  perhaps even, disenfranchising a huge number of voters.

16         Moreover, you're taking over a decision on how to

17  structure the election that was decided upon in the Charter.

18  And the decision to change that by Court fiat, rather than

19  submitting it to the voters, will disenfranchise the voters

20  from the opportunity to participate in the decision.  And the

21  Court's decision, even if it's just for one year, the Court's

22  decision will undoubtedly become a point relied upon by one

23  side of the debate in subsequent years when the decision is

24  again put to the voters.  So it's an important decision.

25         It is a process that has been in place since 1930.

1   And it appears to us that the equities and the public interest

2   favor not disrupting what has been in place for so many years,

3   and not disrupting the rights that have been given to the

4   electorate to make these changes, and not disrupting the right

5   of all the electorate to participate in elections.  But it

6   seems to us that the logical basis and the logical and proper

7   decision, if the Court finds that it must do something about

8   this, is to direct that something be done and it be done in an

9   appropriate way consistent with the structure of local

10  government.  And that is to direct mayor and council to submit

11  a referendum in a timely way at the next general election.

12          Your Honor, that concludes my remarks unless you

13  have any questions.

14          THE COURT:  No.  Thank you, Mr. Rollman.

15          And rebuttal.

16          MR. LANGHOFER:  Thank you, your Honor.  I don't have

17  a great number of points.

18          THE COURT:  I usually say brief rebuttal.  So go

19  ahead.

20          MR. LANGHOFER:  I'll do my best.

21          THE COURT:  Any points you'd like to respond to.

22          MR. LANGHOFER:  Two quick observations.

23          First, Gray v. Sanders involved a primary election

24  and not a general election.  I think opposing counsel

25  mentioned he was uncertain of that at the podium, but it was a

1   primary.

2          Second is, if strict scrutiny is what applies here,

3   the City has not made an argument that the Charter is

4   justified by compelling state interest and narrowly tailored

5   to advance the interest.  I have not heard a merits-based

6   defense if the standard of review is strict scrutiny.

7          Now, the one good point on the merits before we turn

8   to the remedy is the idea that the geographical units for the

9   general election could be different from the geographical unit

10  for the primary election.  It's another way of saying it's two

11  separate elections.  Our view is it's just wrong.  If that is

12  correct, what would stop the City from saying that the primary

13  election for the mayor, for example, will be residents on this

14  particular street.  What would stop that?  It's a different

15  election.  Everyone on that street in the primary election

16  would be treated equally.  Everybody outside would be

17  disenfranchised.  It's plainly unconstitutional.  You can't do

18  that.

19         What would stop the state representatives -- state

20  House of Representatives and Senate from saying primary

21  elections for the United States senator represent the entire

22  state, the general election would be statewide.  But for the

23  junior senator we'll have Congressional Districts 1 through 4

24  do the primary, and for the senior senator, 5 through 9.  More

25  or less equal.  What would keep that from being

1  unconstitutional?

2          This principle that you can vary the geographic unit

3  for the general election and the primary election is a radical

4  principle that would allow extreme disenfranchisement of

5  people in the state and the city.  No court has ever adopted

6  that view with a couple of exceptions I want to address head

7  on.

8          There's the judicial cases, the two that opposing

9  counsel talked about.  They are Stokes and Holshouser.  Both

10  of those cases were similar facts with one important

11  distinction.  There they involved judicial candidates and not

12  representatives who formed general policy for the geographic

13  unit.  Both of those decisions said squarely:  Look, the

14  Fourteenth Amendment doesn't apply to judicial elections.

15  Your Honor doesn't represent someone here.  Your Honor applies

16  the constitution.  Judges everywhere are called upon to apply

17  the constitution because you're not representatives.  There's

18  no one-man-one-vote concerns they held in your election.  Now,

19  they did go on to say in dicta that even if it applied, it

20  wouldn't be a violation; but it was plainly dicta.  The

21  principle that judicial elections aren't governed by

22  one-man-one-vote is obvious.

23          Also, let's think about what those cases are.  They

24  are two cases from more than 40 years ago, that are from lower

25  courts.  One summarily affirmed.  We had the discussion about

1  what that means.  I don't need to repeat it.  And they both

2  predate Bullock v. Carter.  In our view, Bullock v. Carter is

3  the seminal case on the idea that the primary election is

4  entitled to full equal protection clause protections.  There's

5  been some discussion in some previous cases, but both those

6  judicial decisions predate Bullock and puts to bed any

7  argument that primary elections aren't fully protected

8  constitutionally.

9         Now, so there are additionally, in addition to the

10  two judicial cases, a couple of other cases cited in the

11  opposing brief and discussed here at the podium.  I don't

12  think we need to discuss this in detail.  Your Honor can see

13  them for yourself, but I do want to make a point.  Those are

14  very old cases.  The other cases, apart from the judicial

15  ones, the countenance and arrangement like that, are

16  exceedingly old.  One is from 1916.  One mentioned at the

17  podium literally predates the Fourteenth Amendment.

18  Literally, there were slaves in the United States of America

19  when that case was being decided.  The idea that the primary

20  election can be -- the geographic unit can be different, you

21  can have a street, for example, nominating the mayor, that

22  just cannot be squared with modern, equal protection

23  jurisprudence.

24         So what do we have to look at?  I want to have a

25  very small quote here from Gray vs. Sanders.  This is word for

word from the decision.  "Once the geographical unit for which the representative is to be chosen is designated," here we have agreed that's the City, "all who participate in the election are to have an equal vote, whatever their race," I'll skip some words here, "and wherever their home may be in that geographical unit."

I think it's extremely difficult to argue that two judicial decisions to which the Fourteenth Amendment does not apply is more persuasive than this language directly from the United States Supreme Court in Gray vs. Sanders.

Now, your Honor, on the issue of remedy, a couple of passing remarks.

First, the four-part standard for preliminary injunctions from Winter and American Trucking shouldn't apply here.  We're past the PI stage.  We're at the trial on the merits.  So if we're correct about the violation, there has to be some remedy without discussing irreparable injury and the normal foilments that we have under the Winter test.

Second point is that the City acknowledges if there's going to be a remedy, the Court could put on the -- could direct the city council and the mayor to put on the ballot a referendum.  And I want to think through carefully the mechanics of that.  The city council doesn't have the authority to say we are changing the Charter.  They have the option of referring the option of a Charter amendment to the

1    city voters.  But they don't get to say we're changing it,

2    which change do you prefer?  Constitutionally, I don't believe

3    they have that power.

4         So to give effect to claim the City has talked

5    about, I think what we could do mechanically is the Court

6    could say pending any referendum, we will have ward-by-ward

7    elections.  I would really like for the City to put on the

8    ballot the idea of if they'd like to go to at-large elections

9    they can.  But the City itself does not have the power without

10   order of the Court to force the voters to adopt a change to

11   the Charter.  I hope that concept is clear.

12        So what the referendum could do is amend the Charter

13   to something that's constitutional; for example, at-large

14   election.  But in the interim there would have to be -- you

15   have to have some way of forcing the change, and I think the

16   order of the Court could do that recognizing the voters may

17   fix it on their own.

18        There's finally the argument that if the Court does

19   anything for the 2015 election, you would have half the city

20   without a representative on city council, so the remedy would

21   result in a disenfranchisement.  And if we think about how

22   that plays out over time, the same argument can be made

23   election cycle after election cycle.  If the Court can't

24   remedy it now, in 2017 we could be back before you and say the

25   same thing.  Well, look, everyone -- if the other wards that

1    are not having elections now, primary elections now, are

2    forced to do ward-only then, word-only all the way through the

3    general election, then half the city we're talking about now

4    would have no representative on the city council for the next

5    two years.  You could make this argument every election cycle

6    and therefore perpetuate disenfranchisement ad infinitum.

7    There's nothing to repeat them from repeating the same

8    argument next time.

9            So what it boils down to, because there has

10   historically been a deprivation of the right to vote, we have

11   to make sure, so everything is fair, we keep depriving the

12   right to vote out into eternity.  That just doesn't plainly

13   work.

14           Here's what we can reasonably disagree about.

15   Without a remedy from this Court, individuals like Ken Smalley

16   and Ann Holden, the plaintiffs in this case, and literally

17   hundreds of thousands of other people in the city will be

18   represented on -- they will have representatives elected at

19   this election and they will be categorically denied the right

20   to vote in the nomination process for those people.  That is a

21   concrete fact.  And to fix that, to fix collective

22   disenfranchisement of hundreds of thousands of people, this

23   Court -- you cannot have an equal protection of that scope for

24   this duration that lacks any remedy of law.

25           Thank you.

1            THE COURT:  Thank you, counsel.

2            And I appreciate the oral argument and the thorough

3    briefing.  I know that obviously timing is an important factor

4    here with all of the deadlines that have been outlined

5    particularly by the City.  So I will make my best efforts to

6    rule promptly.  I'm not going to tell you specifically a

7    particular day.

8            So if there's nothing further, then, I thank both

9    sides and we'll stand at recess in this matter.

10           MR. LANGHOFER:  Thank you, your Honor.

11           MR. McLAUGHLIN:  Thank you, your Honor.

12       (Proceedings concluded at 10:20 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                        Dated this 24th day of June, 2015.

8                        /s/Cheryl L. Cummings

9                        Cheryl L. Cummings, RDR-CRR-RMR
                         Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25